**UNITED STATES of America,**
**Plaintiff,**

v.

**Randy Michael BRODNIK and**
**Anthony Ira Kritt,**
**Defendants.**

**Criminal Action No. 1:09–cr–00067.**

United States District Court,
S.D. West Virginia,
Bluefield Division.

April 29, 2010.

528

L. Anna Forbes, U.S. Attorney's Office, Charleston, WV, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

IRENE C. BERGER, District Judge.

The Court has reviewed motions filed by both Defendants Randy Brodnik and Anthony Kritt and the United States. Defendant Brodnik's Motion to Dismiss Indictment in Part [Docket 52]; Second Motion to Dismiss Indictment in Part [Docket 94]; Supplement to Second Motion to Dismiss Indictment in Part [Docket 96]; Response to Mr. Kritt's Motion to Dismiss [Docket 97]; Motion to Strike the Expert Testimony of Robert L. Sommers [Docket 53]; and Motion for Discovery [Docket 61] are pending. Defendant Kritt's Motion to Dismiss the Superseding Indictment [Docket 92] is also pending, as is the United States' Motion to Disqualify Dr. Brodnik's Counsel, Mr. Robert J. Stientjes, Due to Conflict of Interest [Docket 49].

By Order of Reference filed on March 26, 2009, the Court referred this matter to United States Magistrate Judge R. Clarke VanDervort "for the purpose of doing all things proper to hear and determine or make recommendations for disposition of any pretrial motions filed in this case including, without limitation, conducting a hearing on the motions, if necessary, and entering into the record a written order setting forth the disposition of the motion or recommendation for disposition, as the case may be." [Docket 7]. Magistrate Judge VanDervort filed his Proposed Findings and Recommendation ("PF & R") on February 17, 2010, 2010 WL 2267858. [Docket 112]. In that filing, Magistrate Judge VanDervort recommended that the undersigned deny Defendants' motions, and grant the motion of the United States.

 The Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed. *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). In addition, failure to file timely objections constitutes a waiver of de novo review and Defendants' right to appeal this Court's order. *See Snyder v. Ridenour,* 889 F.2d 1363, 1366 (4th Cir. 1989); *United States v. Schronce,* 727 F.2d 91, 94 (4th Cir.1984).

However, a defendant must cite to specific instances of error. *United States v. Midgette,* 478 F.3d 616, 621 (4th Cir.2007) (stating that "[28 U.S.C.] Section 636(b)(1) does not countenance a form of generalized objection to cover all issues addressed by the magistrate judge; it contemplates that a party's objection to a magistrate judge's report be specific and particularized, as the statute directs the district court to review only *those portions* of the report or *specified* proposed findings or recommendations *to which objection is made.*") (internal citations and quotations omitted) (emphasis in original). As the Fourth Circuit further stated in *Midgette:*

[a] party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.... To conclude otherwise would defeat the purpose of requiring objections. We would be permitting a party to appeal any issue that was before the magistrate judge, regardless of the nature and scope of objections made to the magistrate judge's report. Either the district court would then have to review every issue in the magistrate judge's proposed findings and recommendations or courts of appeals would be required to review issues that the district court never considered. In either case, judicial resources would be wasted and the district court's effectiveness based on help from magistrate judges would be undermined.

*Id.* at 622. *See also* Fed.R.Crim.P. 59(b)(2) (requiring objecting party to file

"*specific,* written objections to the proposed findings and recommendations") (emphasis added).

Here, objections to Magistrate Judge VanDervort's PF & R were due by March 8, 2010, pursuant to 28 U.S.C. § 636(b)(1) and Fed.R.Crim.P. 59. Defendants timely filed objections [Docket 116 and 117], to which the United States responded [Docket 118]. The undersigned now reviews de novo the portions of Magistrate Judge VanDervort's PF & R to which Defendants Brodnik and Kritt objected.[1]

## I. BACKGROUND

Defendant Randy Michael Brodnik, D.O., is an osteopathic physician with an obstetrics and gynecology practice, Bluefield Women's Center, Inc. ("BWC") in Bluefield, West Virginia. Defendant Anthony Kritt is a Maryland resident and attorney. Defendants were charged in a seven count Indictment filed on March 18, 2009, and an eight count Superseding Indictment filed on November 3, 2009. The Indictment and Superseding Indictment allege that Defendants violated the tax laws of the United States through "an elaborate 'employee-leasing' scheme" (Docket 67 at 2) that stretched from Defendant Brodnik's medical practice in rural Bluefield, West Virginia to the distant overseas locales of Ireland, Hungary, Cyprus, the Channel Islands, Nevis, and the Isle of Man. The Indictment charges Defendants with conspiring to defraud the United States of income taxes in violation of 18 U.S.C. § 371[2] (Count One) and separate counts of income tax evasion for tax years 1999 (Count Three), 2000 (Count Four), 2001 (Count Five), 2002 (Count Six) and 2003 (Count Seven) in violation of 26 U.S.C. § 7201.[3] Count Two also alleged income tax evasion for the tax year 1998, but only named Defendant Brodnik. The Superseding Indictment added Count Eight, which charged that Defendants "did endeavor to corruptly obstruct and impede, and did corruptly obstruct and impede, the due administration of the internal revenue laws" and aided and abetted each other in doing so in violation of 26 U.S.C. § 7212(a) and 18 U.S.C. § 2.[4] (Docket 66).

1. The Court notes that Defendants did not file objections as to all of the above motions.

2. 18 U.S.C. § 371 states that "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." To prove a violation of 18 U.S.C. § 371, the United States must show " '(1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the [agreement's] objectives, and (3) an intent on the part of the conspirators to agree, as well as to defraud the United States.' " *United States v. Vogt,* 910 F.2d 1184, 1202 (4th Cir.1990) (quoting *United States v. Shoup,* 608 F.2d 950, 956 (3rd Cir.1979)).

3. 26 U.S.C. § 7201 states that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution." "To obtain a conviction under [26 U.S.C. § 7201], the Government must prove willfulness, a substantial tax deficiency, and an affirmative act constituting an attempted evasion of the tax." *United States v. Goodyear,* 649 F.2d 226, 227–28 (4th Cir.1981). An affirmative act of evasion is one "the likely effect of which would be to mislead or conceal." *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943).

4. 26 U.S.C. § 7212(a) provides that "[w]hoever corruptly ... endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this

Count One of the Superseding Indictment alleges that Defendants conspired to conceal from the Internal Revenue Service ("IRS") income that Defendant Brodnik earned from BWC, via an "elaborate 'employee-leasing' scheme." (Docket 66 at ¶ 4). The Superseding Indictment alleges that Defendants created and used a number of domestic and foreign entities (*Id.* at ¶ 6) and executed "sham 'employee leasing' contracts" and created and used international bank accounts, shell corporations, and other entities in furtherance of the scheme. (*Id.* at ¶¶ 5 and 9). The Superseding Indictment charges that Defendants committed overt acts "within the Southern District of West Virginia, and elsewhere." (*Id.* at ¶ 12). The Superseding Indictment describes the overt acts as beginning with the execution of three contracts in September, 1998, that made Defendant Brodnik an employee of a company in Ireland, transferred that company's rights to a Nevada company which Defendant Kritt created, and leased Defendant Brodnik to BWC. (*Id.* at ¶ 13) The Superseding Indictment alleges that thereafter BWC transferred millions of dollars of untaxed income earned by Mr. Brodnik to his overseas accounts (*Id.* at ¶¶ 13, 14, 20, 25, 30 and 35) and that Defendant Kritt prepared (*Id.* at ¶¶ 23, 27, 33, 37, and 42) and Defendants filed false and fraudulent corporate and personal income tax returns claiming deductions of amounts attributable to Defendant Brodnik's "medical services as a 'leased' employee" declaring substantially reduced amounts as income to Defendant Brodnik. (*Id.* at ¶¶ 16, 18, 22, 24, 28, 29, 32, 34, 36, 38, 41, 43, and 45). The Superseding Indictment alleges that, in 2000 and 2002, Defendants obtained lines of credit through the foreign entities which they were using so that Defendant Brodnik could take loans upon the funds which he had on account with the understanding that he would pay interest upon the loans which "was a sham since any interest payments [he] made would be returned to [the foreign entity], less administrative fees, to [his] ... account". (*Id.* at ¶¶ 6(h), 21 and 31).

Paragraph 2 of Counts Two through Seven of the Superseding Indictment alleges that "in the Southern District of West Virginia and elsewhere" Defendants willfully attempted to evade income tax which Defendant Brodnik owed by creating "sham 'employee-leasing' contracts" and holding Defendant Brodnik out as an employee of foreign leasing companies under "a sham device," causing BWC to make payments of significant amounts in accordance with the sham contracts and device; and filing false personal and corporate income tax returns for the years 1998, 1999, 2000, 2001, 2002 and 2003. Paragraph 2 of Counts Two through Seven of the Superseding Indictment contains the following subparagraph (f) as an alleged affirmative act which was not originally in the Indictment:

> filing with the IRS materially false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for tax years 2004 and 2005 that falsely claimed, among other things, that Defendant RANDY

---

title, or in any other way corruptly ... obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title, shall, upon conviction thereof, be fined not more than $5,000, or imprisoned not more than 3 years, or both...." "In order to prove a violation of 26 U.S.C. § 7212(a), the government must prove that the defendant: 1) corruptly; 2) endeavored; 3) to obstruct or impede the administration of the Internal Revenue Code." *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir.1997). 18 U.S.C. § 2(a) provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

MICHAEL BRODNIK had been an employee of a Hungarian company.

Count Eight of the Superseding Indictment charges that Defendants "did endeavor to corruptly obstruct and impede, and did corruptly obstruct and impede, the due administration of the internal revenue laws" and aided and abetted each other in doing so in violation of 26 U.S.C. § 7212(a) and 18 U.S.C. § 2. Count Eight alleges that Defendants did so, among other things, as follows:

c. by causing to be prepared, subscribed to and filed with the IRS on or about October 15, 2008, an Amended U.S. Individual Income Tax Return for the year 2007, Form 1040X, which falsely described Defendant RANDY MICHAEL BRODNIK's offshore funds as 'Deferrals and Related Earnings .... from Foreign Employer's Nonqualified Deferred Compensation Plan,' when, in fact, Defendant BRODNIK had no foreign employer and when his offshore funds were not 'nonqualified deferred compensation,' but rather were untaxed income he earned and secreted in offshore accounts;

d. in mid-to-late 2008, as the criminal investigation was nearing its conclusion, Defendant RANDY MICHAEL BRODNIK caused and directed an individual known to the Grand Jury ('The Known Person') to do the following acts:

i. To correspond in June 2008, with the Guernsey-based firm, Blenheim, and request that Defendant BRODNIK's purported foreign 'employer' wire Defendant BRODNIK more than $2.0 million from his secret offshore accounts for the purposes of paying federal income taxes owed by Defendant BRODNIK and evading criminal prosecution;

ii. To send to Blenheim, in or about June 2008, a so-called 'Distribution Agreement' that characterized the transfer of funds by the 'foreign employer' as an 'early distribution' from Defendant RANDY MICHAEL BRODNIK's purported 'deferred compensation plan';

iii. To cause Blenheim to send in or about October and November 2008, by wire transfer more than $2.2 million of funds that Defendant RANDY MICHAEL BRODNIK had previously claimed he could not access and control; and,

iv. Just a few months prior to the date of the original March 2009 Indictment, to pay over to the IRS nearly $2.0 million dollars of Defendant BRODNIK's unpaid federal taxes that had accumulated interest- and penalty-free over the preceding decade.

"The Known Person" referred to in subparagraph (d) is Defendant Brodnik's counsel, Mr. Robert J. Stientjes.

## II. PENDING MOTIONS

A. *Defendant Brodnik's Motion to Dismiss Indictment in Part, Second Motion to Dismiss Indictment in Part, Supplement to his Second Motion to Dismiss Indictment in Part and Response to Mr. Kritt's Motion to Dismiss; and Defendant Kritt's Motion to Dismiss the Superseding Indictment.*

### 1. Description of Motions

In his Motion to Dismiss Indictment in Part (Docket 52), Defendant Brodnik requests that Paragraph 45 of Count One [5]

---

**5.** Paragraph 45 of Count One of the Indictment charges that "[i]n or about October 2008, the Defendant RANDY MICHAEL BRODNIK subscribed and caused an Amended U.S. Individual Income Tax Return for the year 2007, Form 1040X, to be filed with the IRS, which stated that he had in excess of $5.5 million in offshore funds." Defendant

and Paragraph 2(f) of Counts Two through Seven of the Indictment[6] be dismissed. In short,[7] Defendant Brodnik claims that he believed that employee leasing and foreign deferred compensation plans were legal. However, pursuant to enactment of 26 U.S.C. § 409A in 2004, and the IRS's issuance of IRS Notice 2006–33, Defendant Brodnik claims that he then paid federal income tax and interest, via a 2007 Form 1040X, on the funds which were in the foreign deferred compensation plan. Defendant Brodnik argues that because he complied with 26 U.S.C. § 409A and IRS Notice 2006–33, it is improper for the United States to claim that he acted criminally. In the alternative, he argues that even if he did not act in compliance with the law, he "could have not intended to violate the law by filing the 2007 Form 1040X when the law does not contain clear standards of conduct." (Docket 52 at 7). He claims that the paragraphs of the Indictment that he wishes dismissed "attempt to impose requirements upon Defendant Brodnik that are not required upon the face of IRS Notice 2006–33." (*Id.* at 8). Further, he argues that "[a]lthough Defendant Brodnik maintains that IRS Notice 2006–33 is not ambiguous and that

he followed its guidance, even if his interpretation is incorrect, the ambiguity of IRS Notice 2006–33 compels this Court to dismiss [the aforementioned paragraphs of the Indictment] because Defendant Brodnik cannot be prosecuted for allegedly violating ambiguous guidance in IRS Notice 2006–33. (*Id.* at 10).

In his Second Motion to Dismiss the Indictment in Part (Docket 94), Defendant Brodnik requests that the Court dismiss Paragraph 45 of Count One, Paragraphs 2(f) and (g) of Counts Two through Seven,[8] and Paragraphs 2(c) and (d) of Count Eight of the Superseding Indictment.[9] This motion incorporates the arguments that he made in his initial Motion to Dismiss the Indictment in Part. He also argues that the United States included Paragraph 2(f) of Counts Two through Seven of the Superseding Indictment in order to keep the statute of limitations open for years for which the six year period would have otherwise expired. Defendant Brodnik further argues that Paragraphs 2(c) and (d) of Count Eight of the Superseding Indictment were only included "for the sole purpose of 'bootstrapping' its Motion to Disqualify Counsel Stientjes," in violation of the Sixth Amendment. (Docket 94

---

RANDY MICHAEL BRODNIK also falsely described on this form that these funds were "Deferrals and Related Earnings … from Foreign Employer's Nonqualified Deferred Compensation Plan," when, in fact, he had no foreign employer and that his offshore funds were not "nonqualified deferred compensation, but rather were untaxed income he earned and secreted in offshore accounts."

**6.** Paragraphs 2(f) of Counts Two though Seven of the Indictment alleges that as an act in furtherance of tax evasion from 1998 through 2003, Defendants Brodnik and Kritt "causing to be prepared, subscribed to and filed with the IRS on or about October 15, 2008, an Amended U.S. Individual Income Tax Return for the year 2007, Form 1040X, which stated that Defendant BRODNIK had in excess of $5.5 million in offshore funds. Defendant

BRODNIK also falsely described these funds as 'Deferrals and Related Earnings …. from Foreign Employer's Nonqualified Deferred Compensation Plan,' when, in fact, Defendant BRODNIK had no foreign employer and that his offshore funds were not 'nonqualified deferred compensation,' but rather were untaxed income he earned and secreted in offshore accounts."

**7.** See the PF & R for a full description of Defendants' motions.

**8.** Paragraph 2(f) of of Counts Two through Seven of the Superseding Indictment

**9.** In the Superseding Indictment, the United States added Paragraph 2(f), thus making Paragraph 2(f) of the Indictment Paragraph 2(g) of the Superseding Indictment.

at 5). In his Supplement to the Second Motion to Dismiss Indictment in Part, Defendant Brodnik used an expert report from Mr. Eric Johnson to support his propositions.

In Defendant Kritt's motion to dismiss the Superseding Indictment (Docket 92) he argues that:

1. The deferred foreign compensation program at issue in this case cannot give rise to criminal liability because the law is undecided as to the deferred foreign compensation program.

2. Counts Two, Three, Four and Five are time barred by the six-year statute of limitations per 26 U.S.C. § 6531.

3. The [I]ndictment is multiplicitous.

4. The [S]uperseding [I]ndictment was improperly issued for the purpose of making codefendant Randy Brodnik's counsel, Robert Stientjes, a witness.

5. The [S]uperseding [I]ndictment was improperly issued for the purpose of saving the six-year statute of limitations, which has already tolled.

6. For such further reasons set forth in Mr. Kritt's memorandum of law in support of this motion.

Finally, in his Response to Defendant Kritt's Motion to Dismiss, Defendant Brodnik argues that "[t]he ambiguity of the tax law upon which the Superseding Indictment is based compels this Court to dismiss the Superseding Indictment because Defendants cannot be prosecuted for allegedly violating ambiguous tax law." (Docket 97 at 5).

### 2. Objections

#### a. Defendant Brodnik's Objections

As noted above, Magistrate Judge VanDervort recommended in his PF & R that the Court deny the above Motions. Both Defendants timely filed objections to the PF & R.

█ The Court observes that many of Defendant Brodnik's objections—some of which have been adopted by Defendant Kritt—are directed at re-litigating, in their entirety, the issues that were raised before Magistrate Judge VanDervort. To the extent that Defendants attempt to do so, their objections are overruled. Such general objections are inappropriate. This Court will only review objections that are specific and particularized. *Midgette*, 478 F.3d at 621–22.

In response to the PF & R, Defendant Brodnik makes the following specific and particularized objections. First, he argues that Magistrate Judge VanDervort improperly "lumps Defendant Brodnik's Motion to Dismiss in Part with Defendant Kritt's Motion to Dismiss," and did not address the arguments in Defendant Brodnik's motion. (Docket 116 at 12).

Next, Defendant Brodnik argues that because the PF & R stated that

[w]hile it does not appear that Mr. Stientjes acted in any way in furtherance of the Defendants' conduct as alleged [in Paragraph 2(d) of Count Eight of the Superseding Indictment] . . . he nevertheless was principally involved in negotiations and transactions which brought their conduct to an end.

(Docket 112 at 36), the PR & F should have, therefore, dismissed Paragraph 45 of Count One, Paragraphs 2(f) and (g) of Counts Two through Seven, and Paragraphs 2(c) and (d) of Count Eight because the PF & R concluded that the actions of Mr. Stientjes did not "amount to a continuing act or obstruction of an investigation." (*Id.* at 18).

Defendant Brodnik also argues that he had a duty of consistency. Because he reported to the IRS from 1998–2003 that

his deferred compensation plan is a valid nonqualified deferred compensation plan, Defendant Brodnik argues that he was "required by the duty of consistency to report and pay tax on [the 2007 Form 1040X] when the law requires reporting and payment from valid nonqualified deferred compensation plans . . . . even if the plan was invalid." (*Id.* at 19–20). Due to this, Defendant Brodnik claims that the United States' argument that the filing of the 2007 Form 1040X and the payment of tax are continuing acts or obstruction of the investigation lacks merit.

Pursuant to his argument that the PF & R incorrectly lumped his and Defendant Kritt's motions to dismiss together, Defendant Brodnik submitted a separate objection regarding Magistrate Judge VanDervort's denial of Defendant Kritt's motion to dismiss and Defendant Brodnik's response in support. This objection deals with the issue of ambiguous law. Defendant Brodnik argues that the PF & R "incorrectly determines that the allegations do not rest upon ambiguous law, and this case is distinguishable from *United States v. Critzer*, 498 F.2d 1160 (4th Cir.1974) and *United States v. Mallas*, 762 F.2d 361 (4th Cir. 1985)." (*Id.* at 2). Again, Defendant Brodnik spends much of this objection attempting to wholly re-litigate issues that were raised before Magistrate Judge VanDervort. As noted early, the Court overrules such general objections. However, Defendant Brodnik does point to several alleged errors with specificity and particularity.

First, Defendant Brodnik argues that Magistrate Judge VanDervort erroneously avoided the issue that the definition of "constructive receipt" prior to the enactment of 26 U.S.C. § 409A was ambiguous

by stating that the question in the instant case is whether Defendant Brodnik's deferred compensation plan is a valid or invalid nonqualified deferred compensation plan. Defendant Brodnik argues that this is "clearly incorrect, as whether the plan is valid or invalid rests on whether the beneficiary maintains 'constructive receipt.' The concepts of valid vs. invalid cannot be arbitrarily separated from the determination of whether there exists constructive receipt. The two questions are identical." (*Id.* at 26).

Further, Defendant Brodnik argues that the PF & R ignores the definition of a nonqualified deferred compensation plan that was provided in the legislative history to 26 U.S.C. § 409A,[10] and that this definition is "very broad, open-ended, and clearly applies to the fact of Defendant Brodnik's deferred compensation plan." (*Id.*). Regarding the United States's argument that his deferred compensation plan does not meet this definition because the plan is fraudulent, he argues that

this argument is inseparable from the previous argument regarding a valid vs. an invalid plan. Again, the question of whether a nonqualified deferred compensation plan is fraudulent rests upon the determination of whether there exists constructive receipt by the beneficiary. In addition, this argument is clearly erroneous given that the comments of Assistant Secretary of Treasury, Pam Olson, are specifically addressing Defendant Brodnik's-type of deferred compensation plan. The United States can point to no facts that distinguish the foreign nonqualified deferred compensation plans discussed by Assistant Secretary of Treasury from

---

**10.** "A nonqualified deferred compensation plan is any plan that provides for the deferral of compensation other than a qualified employer plan or any bona fide vacation leave, sick leave, compensatory time, disability pay, or death benefit plan." H.R.Rep. No. 108–548, at 354 (2004).

the nonqualified deferred compensation plan of Defendant Brodnik. Thus, Defendant Brodnik's plan clearly is addressed by 26 U.S.C. § 409A and Notice 2006–33.

(*Id.* at 27). He finishes this objection with the conclusion that the "murky realm of the taxation of nonqualified deferred compensation plans from 1998–2003 can hardly be classified as common sense. Congress and the IRS acknowledged that much in providing 26 U.S.C. § 409A and Notice 2006–33." (*Id.* at 30).

### b. Defendant Kritt's Objections

Defendant Kritt makes the following objections to the PF & R:

1. On page 16 of the Magistrate Judge's decision he states: "Following the direction of the Fourth Circuit in Schmidt, the undersigned finds that basic tax law applicable to Defendants' conduct as alleged in the Superseding Indictment was clear and well defined well before Defendants engaged in it." On page 17 of the Magistrate Judge's decision he states: "Whether Defendants' non-qualified deferred compensation plan was legitimate or was created to evade the payment of income taxes is a question of fact for a jury."

2. Defendant Kritt incorporates by reference the analysis on pages 12 through 20 of Defendant Brodnik's objections [Document 116].

3. The committee report for HR 110–431, the bill that introduced IRC § 457A, attached hereto as Exhibit 1, shows the law was unclear prior to the enactment of Sec. 409A.

> Prior to the enactment of section 409A, while the general tax principles governing deferred compensation were well established, the determination whether a particular arrangement effectively allowed deferral of income was generally made on a facts and circumstances basis. There was limited specific guidance with respect to common deferral arrangements. The Congress believed that it was appropriate to provide specific rules regarding whether deferral of income inclusion should be permitted and to provide a clear set of rules that would apply to these arrangements. The Congress believed that certain arrangements that allow participants inappropriate levels of control or access to amounts deferred should not result in deferral of income inclusion. The Congress also believed that certain arrangements, such as offshore trusts, which effectively protect assets from creditors of the employer, should be treated as funded and not result in deferral of income inclusion to the extent the amounts are vested.

(Docket 117 at 1–3).

### 3. Discussion

### a. Defendant Brodnik's Objections

In reviewing Defendant Brodnik's motions and objections, the Court observes that Defendant Brodnik misstates the indictments and issues in this case. Contrary to how he has framed his arguments, the United States is not alleging that his deferred compensation plan was illegal. Rather, the United States is arguing that his deferred compensation plan was used for the illegal purpose of evading income taxes. Defendant Brodnik has artfully attempted to focus the Court's attention on the law of deferred compensation plans. However, despite Defendant Brodnik's arguments, such plans and the law supporting them are not the ultimate issue in this case.

Defendant Brodnik objects that the PF & R improperly discussed his and Defendant Kritt's motions to dismiss together, and that Magistrate Judge VanDervort did not address Defendant Brodnik's motion.

The undersigned finds that this objection lacks merit. Defendant Brodnik argued in his first motion to dismiss, inter alia, that 26 U.S.C. § 409A and IRS Notice 2006–33 "lack clear meaning." (Docket 52 at 7). Defendant Kritt, meanwhile, argued that "the law is undecided as to the deferred foreign compensation program," (Docket 34 at 1) to which Defendant Brodnik replied "that the tax law relied upon by the United States in this case is ambiguous and does not support the allegations in the Superseding Indictment." (Docket 97 at 3). Both motions raise the issue of unclear/ambiguous law, and it was appropriate for Magistrate Judge VanDervort to consider them together.

Defendant Brodnik correctly points out that the PF & R does not discuss the other argument in his first motion to dismiss: that because he complied with 26 U.S.C. § 409A and IRS Notice 2006–33 via his filing of 2007 Form 1040X, it is improper for the United States to claim that he acted criminally. Even so, however, this argument fails. In Paragraph 45 of Count One and Paragraph 2(g) of the Superseding Indictment, the United States alleges that, on the 2007 Form 1040X, Defendant falsely described over $5.5 million in offshore funds as " 'Deferrals and Related Earnings .... from Foreign Employer's Nonqualified Deferred Compensation Plan,' when, in fact, [he] had no foreign employer and that his offshore funds were not 'nonqualified deferred compensation,' but rather were untaxed income he earned and secreted in offshore accounts." As the United States is arguing that Defendant Brodnik actually had no foreign employer, and that the funds he described as a nonqualified deferred compensation plan were actually untaxed income hidden in a foreign account, Defendant's Brodnik's alleged compliance with 26 U.S.C. § 409A and IRS Notice 2006–33 is of no import. Even if Defendant Brodnik complied with those provisions, such compliance does not

resolve the allegation that his foreign employer was fraudulent and that, therefore, his self-described nonqualified deferred compensation plan was, in fact, simply untaxed income that he hid overseas. That question is one for the jury.

Defendant Brodnik's argument that, because Magistrate Judge VanDervort stated that "it does not appear that Mr. Stientjes acted in any way in furtherance of the Defendants' conduct" as alleged [in Paragraph 2(d) of Count Eight of the Superseding Indictment], the PR & F should have, therefore, dismissed Paragraph 45 of Count One, Paragraphs 2(f) and (g) of Counts Two through Seven, and Paragraphs 2(c) and (d) of Count Eight because the PF & R concluded that the actions of Mr. Stientjes did not "amount to a continuing act or obstruction of an investigation" (Docket 116 at 18) also lacks merit. First, Defendant Brodnik takes Magistrate Judge VanDervort's words out of context, as the portion of the PF & R that he cites actually relates to the issue of whether Mr. Stientjes should be disqualified. Moreover, if one takes the time to actually read the text of the PF & R, Magistrate Judge VanDervort never wrote that Mr. Stientjes' conduct did not "amount to a continuing act or obstruction of an investigation." Even assuming *arguendo* that the PF & R did make such a conclusion, such a conclusion would be inappropriate. Whether Mr. Stientjes acted in a way that amounted to a continuing act or obstruction of an investigation is a question of fact for the jury. To the extent that the PF & R may imply this, it does so incorrectly.

Next, Defendant Brodnik's argument regarding the duty of consistency is without merit. The duty of consistency "prevents a taxpayer who has already had the advantage of a past misrepresentation—in a year now closed to review by the government—from changing his position and, by

claiming he should have paid more tax before, avoiding the present tax." *Lewis v. C.I.R.*, 18 F.3d 20, 26 (1st Cir.1994) (Breyer, C.J.) The duty of consistency is a doctrine of civil tax law. It applies to mistakes of fact, not mistakes of law. *Id.* The duty of consistency exists when three elements are present: "(1) a representation or report by the taxpayer; (2) on which the Commission[er] has relied; and (3) an attempt by the taxpayer after the statute of limitations has run to change the previous representation or to recharacterize the situation in such a way as to harm the Commissioner." *Eagan v. United States*, 80 F.3d 13, 17 (1st Cir.1996) (internal citations omitted).

The duty of consistency is not applicable, as argued, to the case at bar. First, Defendant Brodnik is arguing mistakes of law, not fact, in his motions to dismiss. Second, as the United States pointed out in its response to Defendant Brodnik's objections, there is no evidence that the IRS relied on his assertions that he had an overseas employer and a nonqualified deferred compensation plan. Further, this is a criminal, and not civil, action.

Finally, there are the arguments made by Defendants that the applicable law was ambiguous. Defendant compares his situation to *United States v. Critzer*, 498 F.2d 1160 (4th Cir.1974) and *United States v. Mallas*, 762 F.2d 361 (4th Cir.1985), cases where the Fourth Circuit reversed criminal tax evasion convictions due to unclear law. However, this argument was made before Magistrate Judge VanDervort, and the undersigned will not entertain such a generalized objection.

Defendants' guilt in this case turns not on the characterization of the nonqualified deferred compensation plan, but whether the plan was used to conceal income and assets in a fraudulent manner. *See United States v. Schmidt*, 935 F.2d 1440, 1444 (4th Cir.1991) (stating that the defendants in that case ignored "that a criminal case such as the one with which we here deal turns not on the characterization of the [unincorporated business organization] but on whether, sham or not, the [unincorporated business organization] was used to conceal income and assets in a fraudulent manner.").

In *Schmidt*, Defendants were indicted on tax evasion and other charges after promoting trusts known as unincorporated business organizations ("UBOs"). "Participants in the UBOs could assign income and assets to the trusts and take otherwise unavailable deductions for purely personal expenses and could further avoid the payment of taxes on income by effecting 'distributions' of their income to a financial institution in the Marshall Islands." *Id.* at 1442. Following indictment, defendants moved to have the indictment dismissed because the alleged tax violations were "vague and highly debatable." *Id.* at 1443. The District Court disagreed,[11] and defendants appealed upon conviction. They argued on appeal that the United States could point to no statute, regulation, or court decision that could have served to give appellants fair warning that the sale of UBOs was criminal, as they claimed the issue of tax liability revolved around the subsequent taking of deductions against income generated by the UBOs, an area of the law that they said was riddled by vague and highly debatable interpretations of such portions of the tax code *Id.* at 1448.

The Fourth Circuit rejected this argument, holding that

[h]ere again, appellants have sought to divert attention away from the well-set-

---

11. In fact, the district court observed that "[a]lmost every defendant that is accused of promoting bogus tax shelters attempts to escape prosecution by raising [a *Mallas* ] argument." *United States v. Lewis,* 730 F.Supp. 691, 693 (W.D.N.C.1990).

tled law of what constitutes tax evasion and into the misty realm of UBOs and deductions against personal income. By properly focusing on pertinent tenets of tax law—that earned income is taxable to those who earn it and that dominion and control over property, rather than documentary title, determines to whom the income from that property is taxable—one discovers a number of cases. *See Holman v. Holman [United States ]*, 728 F.2d 462 (10th Cir.1984) (assignment of income doctrine and grantor trust provisions applied to hold trusts mere shams for tax avoidance purposes); *Hanson v. Commissioner*, 696 F.2d 1232 (9th Cir.1983) (same); *Schulz v. Commissioner*, 686 F.2d 490 (7th Cir.1982) (same); *Vnuk v. Commissioner*, 621 F.2d 1318 (8th Cir.1980) (same); *Wesenberg v. Commissioner*, 69 T.C. 1005, 1978 WL 3411 (1978) (same); *Zmuda v. Commissioner*, 731 F.2d 1417 (9th Cir. 1984) (investors, as trustees, had complete control over the income-producing property of the trusts). Hence, contentions of vagueness and debatability simply do not hold up.

*Id.*

In the instant case, Defendants Brodnik and Kritt have attempted to divert the court's attention from the law of tax evasion and into the "misty realm" of nonqualified deferred compensation plans, IRS Notice 2006–33, and 26 U.S.C. § 409A. As in *Schmidt*, the tenets of tax evasion law relevant to the Government's allegations in this case are clear, unambiguous and well settled. Prior to the development of Defendant's scheme in 1998, the law was already quite clear that Defendants could be held liable if Defendant Brodnik's foreign employer and his alleged nonqualified deferred compensation plan were being used to evade taxes. Accordingly, Defendant Brodnik's objections related to the definition of "constructive receipt" prior to the enactment of 26 U.S.C. § 409A and the definition of a nonqualified deferred compensation plan that was in the legislative history of that statute are without merit.

### b. Defendant Kritt's Objections

The court has already noted that it will not entertain generalized objections. Defendant Kritt's first objection does not point the court to a specific and particularized error by Magistrate Judge VanDervort. Therefore, the Court overrules it. His other two objections have already been addressed by the Court, and are overruled as well.

### 4. Conclusion

For the reasons stated above, the undersigned **ADOPTS** the PF & R as to Defendant Kritt's Motion to Dismiss the Superseding Indictment and Defendant Brodnik's Motion to Dismiss Indictment in Part; Second Motion to Dismiss Indictment in Part, Supplement to Second Motion to Dismiss Indictment in Part; and Response to Mr. Kritt's Motion to Dismiss. The Court **OVERRULES** both Defendant Kritt's objections to the PF & R and Defendant Brodnik's first and third objections to the PF & R, and **ORDERS** the above motions denied.

### B. United States' Motion to Disqualify Counsel Due to Conflict of Interest

#### 1. Motion and Defendant Brodnik's Objection

In its motion, the United States requests that the Court disqualify Defendant Brodnik's counsel, Mr. Robert J. Stientjes. It argues that Mr. Stientjes should be disqualified on two different grounds. First, the United States argues that Mr. Stientjes should be disqualified because he may be called as a witness in this case due to the conduct that is alleged in Paragraph 2(d) of Count Eight of the Superseding Indictment. It claims that Mr. Stientjes' alleged conduct amounts to

"powerful evidence of Defendant Brodnik's control of and access to his 'deferred compensation' and evidence of Mr. Stientjes' attempt to further his client's scheme." (Docket 49 at 6). The United States further alleges that Mr. Stientjes may also have a potential conflict of interest, as Mr. Stientjes may "[possibly represent][12] a South Dakota physician who is presently under investigation by the IRS in an nearly identical scheme.... [T]he United States has advised Mr. Stientjes that it wanted to discuss the possibility of obtaining this physician's cooperation against Defendant Anthony Kritt and, in turn, obtaining Defendant Kritt's cooperation against Defendant Brodnik." (Docket 49 at 8). The United States further argued that

> [d]isqualification is appropriate because: 1) evidence of Mr. Stientjes's repatriation of Defendant Brodnik's money from a secret offshore account is highly relevant and admissible evidence; 2) no substantial hardship on Defendant Brodnik will result since trial of this matter is not scheduled until November 2009 and because it is understood that Mr. Stientjes does not intend to function as lead trial counsel; 3) the Judiciary and the Department of Justice have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them; 4) the possibility that Defendant Brodnik will raise a reliance defense mid-trial and blame Mr. Stientjes for giving poor legal advice and thereby cause a mis-trial; and 5) the likelihood that Defendant Brodnik will challenge any conviction on the claim of

ineffective assistance of counsel or some related theory.

(*Id.* at 14–15).

In the PF & R, Magistrate Judge Van-Dervort found no actual or potential conflict of interest. However, Magistrate Judge VanDervort did find that Mr. Stientjes' conduct created an unsworn witness problem. He stated that

> [b]y virtue of his first hand involvement in the circumstances, the United States will likely call Mr. Stientjes to testify about them at trial. Because Mr. Stientjes obtained the funds from Dr. Brodnik's offshore accounts to pay Dr. Brodnik's taxes claiming that there had been changes in the law, it is also likely that Dr. Brodnik and Mr. Kritt might call Mr. Stientjes in their defense.... [H]e ... was principally involved in negotiations and transactions which brought [Defendants'] conduct to an end. In the words of the [*United States v. Evanson*, 584 F.3d 904 (10th Cir.2009)] Court, Mr. Stientjes "assisted in the production of evidence."

(Docket 112 at 36). Magistrate Judge VanDervort accordingly recommended that the Court grant the United States' motion to disqualify Mr. Stientjes.

In his objections, Defendant Brodnik agrees with Magistrate Judge VanDervort's proposed finding that his representation by Mr. Stientjes presents no actual or potential conflicts of interest. Defendant Brodnik argues, however, that Magistrate Judge VanDervort incorrectly concluded that there is an unsworn witness problem. He states that only the United States wishes or plans on calling Mr. Stientjes as a witness, and that disqualification would create a substantial hardship upon him. He further argues that Magis-

---

**12.** Defendant Brodnik's Objection to United States; Motion to Disqualify Counsel states that Mr. Stientjes representation of the physi-

cian, Dr. Edward J.S. Picardi, ended on March 15, 2007. (Docket 51 at 9).

trate Judge VanDervort incorrectly analyzed *United States v. Evanson*, which Defendant Brodnik argues only stands for the proposition "that the Court of Appeals will not revisit the decision of the district court in disqualifying an attorney absent clearly unreasonable circumstances.... [T]he facts of *Evanson* and the decision to disqualify are not subject to any deference." (Docket 116 at 23–23).

### 2. Applicable Law

The right of a defendant to be represented by counsel of his or her choosing is contemplated by the Sixth Amendment. *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). "The District Court must recognize a presumption in favor of [defendant]'s counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Id.* at 164, 108 S.Ct. 1692. Further, "the district court must be allowed substantial latitude ... not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163, 108 S.Ct. 1692.

"An attorney has a potential conflict of interest if the interests of the defendant *could* place the attorney under inconsistent duties in the future." *United States v. Jones*, 381 F.3d 114, 119 (2d Cir.2004) (emphasis in original), citing *United States v. Kliti*, 156 F.3d 150, 153 n. 3 (2d Cir. 1998). Even in situations where there is no conflict of interest, disqualification of counsel may still be necessary if it appears that counsel has "first-hand knowledge of the events presented at trial." *United States v. Locascio*, 6 F.3d 924, 933 (2d

Cir.1993). A defendant's counsel may be disqualified when counsel might be called as a witness for the defendant or be an unsworn witness for the defendant at trial. *Id.* at 934 (stating that "[w]hen an attorney is an unsworn witness ... the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired. Waiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced."); *Kliti*, 156 F.3d at 156 (providing that "[w]hen faced with an attorney as a sworn or an unsworn witness, the proper recourse is to disqualify the attorney, not to exclude the testimony."). In the event of multiple conflicts of interest, said conflicts should be considered together. *United States v. Pizzonia*, 415 F.Supp.2d 168, 177 (E.D.N.Y.2006) (Weinstein, J.). While defendants can waive conflicts of interest in some circumstances, courts have the discretion "to reject a waiver in order to protect the integrity of the judicial proceedings and the public's interest in ensuring a just verdict." *Pizzonia*, 415 F.Supp.2d at 177 (citing *Locascio*, 6 F.3d at 931).

In *United States v. Evanson*, the defendant, an attorney, was charged along with other individuals with conspiring to commit tax fraud, tax evasion and aiding and assisting in preparing false income tax returns. The defendant in that case had hired his counsel prior to his indictment, while the investigation of the United States was still underway. Ten months after the defendant was indicted, the United States moved to disqualify his counsel, Max Wheeler, as it alleged that "Mr. Wheeler was involved in, or had intimate knowledge of, efforts by 'Evanson and others ... to create false documents attempting to substantiate fictitious transactions' and to induce participants to sign misleading documents or give other exculpating

evidence ... The government contended that Mr. Wheeler would, therefore, need to testify at Mr. Evanson's trial." *Id.* at 906. While the magistrate judge in the case ruled against the motion to disqualify, he was reversed by the district court judge, who granted the motion. On appeal, the Tenth Circuit concentrated on two letters which Mr. Evanson had sent to participants in his scheme as presenting the potential for conflict of interest and unsworn witness problems and found that "[t]he district court could reasonably anticipate that the letters would be offered into evidence, and admitted, at trial." *Id.* at 912–13.

The Court found that allowing Mr. Wheeler to remain on the case would also present challenges related to the defense of advice of counsel. If the defendant raised the defense of advice of counsel at trial, said defense would implicate Mr. Wheeler in the alleged unlawful acts. *Id.* at 913. Further, such a defense would raise other problems. First, Mr. Wheeler might become an unsworn witness. Second, said defense would waive the attorney-client privilege, and create the possibility of Mr. Wheeler being called to testify against his client. *Id.* at 914. However, if Mr. Wheeler remained defendant's counsel and defendant did not raise defense of advice of counsel, then, on appeal or in collateral proceedings, the defendant could argue that Mr. Wheeler was constitutionally ineffective in failing to do so. *Id.* at 913.

### 3. Discussion

The Court recognizes that disqualification of Mr. Stientjes would bring hardship to Defendant Brodnik. However, the Court finds that disqualification is necessary given the difficulties that Mr. Stientjes' continued representation of Defendant Brodnik would bring to this case. Mr. Stientjes is an unsworn witness in this case, and has a potential conflict of interest.

Contrary to Defendant Brodnik's assertion, *Evanson* stands for more than the proposition that a court of appeals will not revisit a disqualification decision of a district court absent clear error. While the attorney in *Evanson* did not behave in the way that Mr. Stientjes allegedly did in the instant case, *Evanson* demonstrates that, when a defense counsel in a criminal tax case may have gone from advocacy on behalf of his or her client to possible involvement in the facts of the case, disqualification is necessary. Here, Mr. Stientjes' alleged efforts to repatriate Defendant Brodnik's funds from overseas has made him an unsworn witness. Even if only the United States intends on calling Mr. Stientjes at trial, as Defendant Brodnik claims, Mr. Stientjes "role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *Locascio*, 6 F.3d at 933.

Further, the Court finds that Mr. Stientjes' continued involvement in this case would also bring other difficulties. As the Tenth Circuit recognized in *Evanson*, Mr. Stientjes' representation of Defendant Brodnik at trial would create difficulties at trial and/or on appeal due to the possibility of a reliance of counsel defense, or, if Defendant Brodnik is convicted, the possibility of a claim of ineffective assistance of counsel, if said defense is not used at trial.

However, the undersigned disagrees with Magistrate Judge VanDervort on the question of a potential conflict of interest. The Court finds that there is a potential conflict of interest in this case, due to Mr. Stientjes prior representation of the South Dakota physician, Dr. Edward J.S. Picardi.

Should Dr. Picardi cooperate against Defendant Kritt, and Defendant Kritt cooperate against Defendant Brodnik, Mr. Stientjes would face a conflict of interest. While the court recognizes that Dr. Picardi executed a conflict waiver, Docket 51 at Ex. 7, the Court finds that said waiver is insufficient to prevent a possible conflict.[13]

### 4. Conclusion

For the reasons stated above, the undersigned **ADOPTS** the PF & R as to the United States' Motion to Disqualify Counsel Due to Conflict of Interest, and further **FINDS** that Mr. Stientjes' representation of Defendant Brodnik also creates a potential conflict of interest. The Court **OVERRULES** Defendant Brodnik's second objection to the PF & R, and **ORDERS** the above motion granted.[14]

### C. Defendant Brodnik's Motion for Discovery

#### 1. Motion

In this motion, Defendant Brodnik requests discovery of the following:

1. All books, papers, documents, photographs, tangible objects or copies or portions thereof which pertain to Internal Revenue Service or U.S. Department of Treasury ("IRS") formulating its positions in Notice 2003–22, Notice 2006–33, and Notice 2007–89.

2. All written communications including, but not limited to, electronic mail, written correspondence, and notes, between revenue agents and IRS management, IRS case coordinators, and IRS National Office regarding the interpretation of Notice 2003–22; Notice 2006–33; and Notice 2007–89.

3. All written communication, including but not limited to any internal correspondence of the IRS with respect to the decision by any individuals within the IRS to pursue taxpayers for violating 26 U.S.C. § 409A or failing to comply with Notice 2006–33 or Notice 2007–89, when it was previously alleged that the taxpayers participated in a transaction similar to Notice 2003–22.

4. All names, titles, and contact information of any IRS employee who has knowledge with respect to the policy considerations and the decision-making process behind the decision of the IRS to draft and publish Notice 2003–22, Notice 2006–33, or Notice 2007–89.

5. During an alleged interview of Mik Underdown by Special Agent Robert Lanham on October 7, 2008, Special Agent Robert Lanham tape recorded himself saying, "I have 40,000 pages of documents involved in this case." On its discovery disk, the United States has only turned over approximately 17,000 pages of documents to Defendant Brodnik. Provide the remaining 23,000 of documents in Special Agent Lanham's possession.

6. All Grand Jury testimony of Federal Agents and Experts and all instructions to the grand jury in this case which pertain to the United States' theory of liability of Defendant Brodnik.

---

13. On its own, this potential conflict may not be sufficient for disqualification. However, when taken in conjunction with Mr. Stientjes' role as an unsworn witness, it provides further support for disqualification.

14. The Court has also reviewed Defendant Brodnik's Response to the United States' Notice of Counsel Robert J. Stientjes' Legal Representation (Docket 135). While it appears that the professionalism of counsel in this case is not optimal, both the notice of counsel and the response were filed after the submission of the PF & R and, therefore, have no bearing on the Court's ruling on this issue. The Court will, however, monitor the conduct and professionalism of all counsel as this matter proceeds and take appropriate action as required.

(Docket 61 at 1–2). Magistrate Judge VanDervort denied this motion. He found that Defendant Brodnik

> has not demonstrated that the documents and information pertaining to the development and issuance of the IRS Notices which he requests are within the possession, custody or control of the prosecution in this case and are material to preparing his defense. While Dr. Brodnik may argue that the Notices themselves are fundamental to his defense, Dr. Brodnik has not shown how the requested documents and information refute the United States' charges as set forth in the Superseding Indictment. The documents and information which Dr. Brodnik requests, therefore, fall beyond the scope of allowable discovery under Rule 16(a)(1)(E)(i).

(Docket 112 at 41). While Defendant Brodnik filed objections, he does not direct the court to any specific error made by Magistrate Judge VanDervort. In short, Defendant Brodnik argues that materials related to IRS Notice 2003–22, Notice 2006–33, and Notice 2007–89 are material to his defense for reasons related to his arguments that he was acting in response to 26 U.S.C. § 409A and IRS Notice 2006–33, and that the law applicable to his situation was unclear and/or ambiguous. Out of an abundance of caution, the Court will review de novo Magistrate Judge VanDervort's finding on discovery despite Defendant Brodnik's lack of specific objections.

### 2. Applicable Law

Federal Rule of Criminal Procedure 16(a)(1)(E)(i) provides that:

> (E) Documents and Objects. Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>> (i) the item is material to preparing the defense.

Documents and things are "within the government's possession, custody, or control" if the prosecution has knowledge of and access to them. *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir.1995). Prosecutors are not required to provide documents and things "possessed by agencies which had no part in the criminal investigation or when the prosecution had no control over the agency officials who physically possessed the documents." *United States v. Libby*, 429 F.Supp.2d 1, 6–7 (D.D.C.2006). *See also United States v. Pelullo*, 399 F.3d 197, 216–19 (3d Cir.2005) (holding that the Pension and Welfare Benefits Administration ("PWBA"), a civil arm of the Department of Labor that had been monitoring a separate civil action against the defendant in that case, was not part of the prosecution team as there was "no indication that the prosecution and PWBA engaged in a joint investigation or otherwise shared labor and resources . . . . Nor is there any indication that the prosecution had any sort of control over the PWBA officials who were collecting documents. And [defendant's] arguments to the contrary notwithstanding, that other agents in the DOL participated in this investigation does not mean that the entire DOL is properly considered part of the prosecution team."). Documents and things are "material to preparing the defense" if they would "significantly . . . alter the quantum of proof in [a defendant's] favor." *United States v. Caro*, 597 F.3d 608, 621 (4th Cir.2010). The Supreme Court stated in *United States v. Armstrong*, 517 U.S. 456, 462, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), that "in the context of Rule 16, 'the defendant's defense' means the defendant's response to the Government's case in chief. While it

might be argued that as a general matter the concept of a 'defense' includes any claim that is a 'sword', challenging the prosecution's conduct of the case, the term may encompass only the narrower class of 'shield' claims, which refute the Government's arguments that the defendant committed the crime charged."

### 3. Discussion

The Court has already stated that, despite Defendant's efforts to invoke them, provisions such as 26 U.S.C. § 409A and Notice 2003–22, Notice 2006–33, and Notice 2007–89 are not pertinent to this case. Accordingly, the Court finds that the materials requested by Defendant Brodnik in paragraphs one through four of his motion for discovery are not material. Further, such materials are also not accessible to the government, nor are they in the government's possession. To paraphrase from *Pelullo*, 399 F.3d at 218, there is no indication that the prosecution and the IRS personnel or offices who promulgated the materials requested by Defendant Brodnik engaged in a joint investigation or otherwise shared labor and resources. Nor is there any indication that the prosecution had any sort of control over the IRS officials who promulgated said materials. The fact that IRS agents participated in this investigation does not mean that the entire IRS is properly considered part of the prosecution team. The Court finally notes that it appears that the United States has provided Defendants with the other materials requested in this motion. *See* Docket 106 at 63. Accordingly, the Court denies Defendant Brodnik's motion for discovery.

### 4. Conclusion

For the reasons stated above, the undersigned **ADOPTS** the PF & R as to Defendant Brodnik's Motion for Discovery. The Court **OVERRULES** Defendant Brodnik's fourth objection to the PF & R, and **ORDERS** the above motion **DENIED.**

### III. CONCLUSION

As stated above, the undersigned **ADOPTS** the PF & R as to Defendant Brodnik's Motion to Dismiss Indictment in Part [Docket 52]; Second Motion to Dismiss Indictment in Part [Docket 94]; Supplement to Second Motion to Dismiss Indictment in Part [Docket 96]; Response to Mr. Kritt's Motion to Dismiss [Docket 97]; Motion to Strike the Expert Testimony of Robert L. Sommers [Docket 53]; Motion for Discovery [Docket 61]; and Defendant Kritt's Motion to Dismiss the Superseding Indictment [Docket 92]. The undersigned also **ADOPTS** the PF & R as to the United States' Motion to Disqualify Counsel Due to Conflict of Interest [Docket 49], and further **FINDS** as to that motion that Mr. Stientjes' representation of Defendant Brodnik also creates a potential conflict of interest. The Court **OVERRULES** both Defendants' objections to the PF & R, and **ORDERS** Defendants' motions **DENIED,** and the United States' motion **GRANTED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendants and their respective counsel and the United States Attorney.

### PROPOSED FINDINGS AND RECOMMENDATION

R. CLARKE VanDERVORT, United States Magistrate Judge.

The following Motions are pending:

A. Dr. Brodnik's Motion to Dismiss Indictment in Part (Document No. 52.), Second Motion to Dismiss Indictment in Part (Document No. 94.), Supplement to his Second Motion to Dismiss Indictment in Part (Document No. 96.) and Response to Mr. Kritt's Motion to Dismiss (Document No. 97.) and Mr. Kritt's Motion to Dismiss the Superseding Indictment. (Document No. 92.);

B. The United States' Motion to Disqualify Dr. Brodnik's Counsel, Mr.

Robert J. Stientjes, Due to Conflict of Interest. (Document No. 49.);

C. Dr. Brodnik's Motion to Strike the Expert Testimony of Robert L. Sommers (Document No. 53.); and

D. Dr. Brodnik's Motion for Discovery (Document No. 61.)

Having considered the record and applicable law, the undersigned respectfully recommends that Dr. Brodnik's Motions to Dismiss in Part (Document Nos. 52 and 94.), Mr. Kritt's Motion to Dismiss the Superseding Indictment (Document No. 92.), Dr. Brodnik's Motion to Strike the Expert Testimony of Robert L. Sommers (Document No. 53.) and Dr. Brodnik's Motion for Discovery (Document No. 61.) be denied and the United States' Motion to Disqualify Dr. Brodnik's Counsel, Mr. Robert J. Stientjes, Due to Conflict of Interest (Document No. 49.) be granted.

***The Indictment and Superseding Indictment.***

 Dr. Brodnik, an orthopedic physician in Bluefield, West Virginia, was initially charged along with Mr. Kritt in a seven-count Indictment filed on March 18, 2009 (Document No. 1.), with conspiring to defraud the United States of income taxes through "an elaborate 'employee-leasing' scheme" in violation of 18 U.S.C. § 371 (Count One)[1], and separate counts of income tax evasion for tax years 1998 (Count Two), 1999 (Count Three), 2000 (Count Four), 2001 (Count Five), 2002 (Count Six) and 2003 (Count Seven) in violation of 26 U.S.C. § 7201[2]. By Superseding Indictment filed on November 3, 2009 (Document No. 66.), the United States charged the same offenses as charged in the Indictment and added Count Eight charging that Defendants endeavored to and did corruptly obstruct and impede the due administration of the internal revenue laws and aided and abetted each other in doing so in violation of 26 U.S.C. § 7212(a) and 18 U.S.C. § 2.[3]

Count One of the Superseding Indictment alleges that Dr. Brodnik and Mr.

---

1. 18 U.S.C. § 371 provides that "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." To prove a violation of 18 U.S.C. § 371, the United States must show " '(1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the [agreement's] objectives, and (3) an intent on the part of the conspirators to agree, as well as to defraud the United States.' " *United States v. Vogt*, 910 F.2d 1184, 1202 (4th Cir.1990), *cert. denied*, 498 U.S. 1083, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991), *quoting United States v. Shoup*, 608 F.2d 950, 956 (3rd Cir.1979).

2. 26 U.S.C. § 7201 provides that "[a]ny person who wilfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony, and upon conviction thereof, shall be fined not more than $100,000 ... or imprisoned not more than 5 years, or both, together with the costs of prosecution." "To obtain a conviction under [26 U.S.C. § 7201], the Government must prove willfulness, a substantial tax deficiency, and an affirmative act constituting an attempted evasion of the tax." *United States v. Goodyear*, 649 F.2d 226, 227–228 (4th Cir.1981). An affirmative act of evasion is one "the likely effect of which would be to mislead or conceal." *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943).

3. 26 U.S.C. § 7212(a) provides that "[w]hoever corruptly ... endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly ... obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title, shall, upon conviction thereof, be fined not more than $5,000, or imprisoned not more than 3 years, or both...." "In order to prove a violation of 26 U.S.C. § 7212(a), the government must prove that the defendant: 1) corruptly; 2) endeavored; 3) to obstruct or

Kritt conspired to conceal income which Dr. Brodnik earned through his medical practice, Bluefield Women's Center, Inc. [BWC], located in Bluefield, West Virginia, from the IRS through an "elaborate 'employee-leasing' scheme". (Document No. 66, ¶¶ 2 and 4.) The Superseding Indictment alleges that Defendants created and used a number of domestic and foreign entities (*Id.*, ¶¶ 5 and 6.) and executed "sham 'employee leasing' contracts" and created international accounts in furtherance of the scheme (*Id.*, ¶ 9.). The Superseding Indictment charges that Defendants committed overt acts "within the Southern District of West Virginia, and elsewhere" (*Id.*, ¶ 12.) and describes them beginning with their execution of three contracts in September, 1998, making Dr. Brodnik an employee of a company in Ireland, transferring that company's rights to a Nevada company which Mr. Kritt created and leasing Dr. Brodnik to BWC. (*Id.*, ¶ 13.) The Superseding Indictment alleges that thereafter BWC transferred millions of dollars of untaxed income earned by Mr. Brodnik to his overseas accounts (*Id.*, ¶¶ 13, 14, 20, 25, 30 and 35.), and Mr. Kritt prepared (*Id.*, ¶¶ 23, 27, 33 and 37.) and Defendants filed false and fraudulent corporate and personal income tax returns claiming deductions of amounts attributable to Dr. Brodnik's "medical services as a 'leased' employee" and declaring substantially reduced amounts as income to Dr. Brodnik. (*Id.*, ¶¶ 16, 18, 22, 24, 28, 29, 32, 34, 36, 38, 41, 43 and 45.) The Superseding Indictment alleges that in 2000 and 2002 Defendants obtained lines of credit through the foreign entities which they were using so that Dr. Brodnik could take loans upon the funds which he had on account with the understanding that he

would pay interest upon the loans which "was a sham since any interest payments [he] made would be returned to [the foreign entity], less administrative fees, to [his] ... account". (*Id.*, ¶¶ 6.h, 21 and 31.)

Paragraph 2 of Counts Two through Seven of the Superseding Indictment alleges that "in the Southern District of West Virginia and elsewhere", Defendants willfully attempted to evade income tax which Dr. Brodnik owed by creating "sham 'employee-leasing' contracts" and holding Dr. Brodnik out as an employee of foreign leasing companies under "a sham device", causing BWC to make payments of significant amounts in accordance with the sham contracts and device and filing false personal and corporate income tax returns for the years 1998, 1999, 2000, 2001, 2002 and 2003. Paragraph 2 of Counts Two through Seven of the Superseding Indictment contains the following subparagraph f as an alleged affirmative act which was not in the Indictment:

> filing with the IRS materially false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for tax years 2004 and 2005 that falsely claimed, among other things, that Defendant RANDY MICHAEL BRODNIK had been an employee of a Hungarian company[.]

Count Eight of the Superseding Indictment charges that Defendants "did endeavor to corruptly obstruct and impede, and did corruptly obstruct and impede, the due administration of the internal revenue laws" and aided and abetted each other in doing so in violation of 26 U.S.C. § 7212(a) and 18 U.S.C. § 2. The Superseding Indictment alleges that Dr. Brodnik did so, among other things, as follows:

> c. by causing to be prepared, subscribed to and filed with the IRS on or

impede the administration of the Internal Revenue Code." *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir.1997). 18 U.S.C. § 2(a) provides that "[w]hoever commits an

offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

about October 15, 2008, an Amended U.S. Individual Income Tax Return for the year 2007, Form 1040X, which falsely described Defendant RANDY MICHAEL BRODNIK's offshore funds as 'Deferrals and Related Earnings .... from Foreign Employer's Nonqualified Deferred Compensation Plan,' when, in fact, Defendant BRODNIK had no foreign employer and when his offshore funds were not 'nonqualified deferred compensation,' but rather were untaxed income he earned and secreted in offshore accounts; and

d. in mid-to-late 2008, as the criminal investigation was nearing its conclusion, Defendant RANDY MICHAEL BRODNIK caused and directed an individual known to the Grand Jury ('The Known Person') to do the following acts:

I. To correspond in June 2008, with the Guernsey-based firm, Blenheim, and request that Defendant BRODNIK's purported foreign 'employer' wire Defendant BRODNIK more than $2.0 million from his secret offshore accounts for the purposes of paying federal income taxes owed by Defendant BRODNIK and evading criminal prosecution;

ii. To send to Blenheim, in or about June 2008, a so-called 'Distribution Agreement' that characterized the transfer of funds by the 'foreign employer' as an 'early distribution' from Defendant RANDY MICHAEL BRODNIK's purported 'deferred compensation plan';

iii. To cause Blenheim to send in or about October and November 2008, by wire transfer more than $2.2 million of funds that Defendant RANDY MICHAEL BRODNIK had previously claimed he could not access and control; and,

iv. Just a few months prior to the date of the original March 2009 Indictment, to pay over to the IRS nearly $2.0 million dollars of Defendant BRODNIK's unpaid federal taxes that had accumulated interest- and penalty-free over the preceding decade.

### *The Parties' Motions and Responses.*

On August 27, 2009, the United States filed a Motion to Disqualify Dr. Brodnik's Counsel, Mr. Robert J. Stientjes, Due to Conflict of Interest. (Document No. 49.) On September 10, 2009, Dr. Brodnik filed an Objection to the United States' Motion to Disqualify Counsel (Document No. 51.), a Motion to Dismiss Indictment in Part (Document No. 52.) and a Motion to Strike the Expert Testimony of Robert L. Sommers (Document No. 53.). On September 14, 2009, the United States filed a Consolidated Response to Dr. Brodnik's Objection and Motions. (Document No. 57.) On September 15, 2009, the Court held a hearing upon the pretrial Motions which had been filed at that time, and a transcript of the hearing has been filed. (Document No. 63.) On September 21, 2009, Dr. Brodnik filed a Motion for Discovery. (Document No. 61.) On September 25, 2009, the United States filed a Response to Dr. Brodnik's Motion (Document No. 64.), and on October 5, 2009, Dr. Brodnik filed a Reply (Document No. 65.). On December 28, 2009, Mr. Kritt filed a Motion to Dismiss Superseding Indictment and Memorandum in Support (Document Nos. 92 and 93.), and Dr. Brodnik filed a Second Motion to Dismiss Indictment in Part (Document No. 94.). On December 31, 2009, Dr. Brodnik filed a Supplement to his Second Motion to Dismiss Indictment in Part including as Exhibits the *curriculum vitae* and report of attorney Eric Johnson (Document No. 96.) and a Response to Mr. Kritt's Motion to Dismiss (Document No. 97.). On January 5, 2010, the United

States filed a Supplemental Memorandum in Support of its Motion to Disqualify Counsel Due to Conflict of Interest. (Document No. 99.) On January 6, 2010, the United States filed a Consolidated Response to Defendants' Motions to Dismiss the Superseding Indictment. (Document No. 100.) On January 7, the Court held a further hearing upon the pending Motions of the United States and the Defendants. A transcript of the hearing has been filed. (Document No. 106.) On January 25, the United States filed a Supplemental Memorandum in Support of its Response to Defendants' Motions to Dismiss Indictment Based on Alleged Vagueness of the Tax Laws. (Document No. 107.)

**A. Dr. Brodnik's Motion to Dismiss Indictment in Part (Document No. 52.), Second Motion to Dismiss Indictment in Part (Document No. 94.), Supplement to his Second Motion to Dismiss Indictment in Part (Document No. 96.) and Response to Mr. Kritt's Motion to Dismiss (Document No. 97.) and Mr. Kritt's Motion to Dismiss the Superseding *Indictment. (Document No. 92.)***

By his Motion to Dismiss Indictment in Part, Dr. Brodnik requests dismissal of

Paragraphs 45 of Count One[4] and 2(f) of Counts Two though Seven of the Indictment.[5] He states that in 1998 on the advice of Mr. Kritt he entered into an employee leasing arrangement under which he became an employee of an Irish entity and began participating in a foreign deferred compensation program. (Document No. 52, pp. 1–2.) Apparently, Dr. Brodnik believed that the employee leasing arrangement and foreign deferred compensation program were legal and presented an attractive and significant opportunity to defer taxes upon income for the years until he retired. Dr. Brodnik states, however, that in 2004 Congress enacted 26 U.S.C. § 409A requiring that all amounts previously deferred under a foreign deferred compensation plan be included in income. He states that the IRS then issued IRS Notice 2006–33 requiring that all amounts deferred under a foreign deferred compensation plan be reported as income in 2007 federal income tax returns. He claims that he did so and paid federal income tax and interest upon the funds which he had under the foreign deferred compensation plan in the amount of $2,021,224.32. (*Id.*, p. 3.) Dr. Brodnik claims that on October 15, 2008, he filed a

---

**4.** Paragraph 45 of Count One of the Indictment charged as follows:

In or about October 2008, the Defendant RANDY MICHAEL BRODNIK subscribed and caused an Amended U.S. Individual Income Tax Return for the year 2007, Form 1040X, to be filed with the IRS, which stated that he had in excess of $5.5 million in offshore funds. Defendant RANDY MICHAEL BRODNIK also falsely described on this form that these funds were "Deferrals and Related Earnings ... from Foreign Employer's Nonqualified Deferred Compensation Plan," when, in fact, he had no foreign employer and that his offshore funds were not "nonqualified deferred compensation," but rather were untaxed income he earned and secreted in offshore accounts.

**5.** Paragraphs 2(f) of Counts Two though Seven of the Indictment alleged as an act in furtherance of tax evasion from 1998 through 2003 Defendants' "causing to be prepared, subscribed to and filed with the IRS on or about October 15, 2008, an Amended U.S. Individual Income Tax Return for the year 2007, Form 1040X, which stated that Defendant BRODNIK had in excess of $5.5 million in offshore funds. Defendant BRODNIK also falsely described these funds as 'Deferrals and Related Earnings .... from Foreign Employer's Nonqualified Deferred Compensation Plan,' when, in fact, Defendant BRODNIK had no foreign employer and that his offshore funds were not 'nonqualified deferred compensation,' but rather were untaxed income he earned and secreted in offshore accounts."

2007 Form 1040X amending his 2007 income tax return by reporting an additional $1,962,214 of taxable income in 2007. He contends that he "has fully paid the additional income tax and interest for the 2007 tax year." (*Id.*, p. 4.) He asserts further that "Defendant Brodnik complied with IRS Notice 2006–33 by treating the entire amount of his foreign deferred compensation program as paid as of December 31, 2007 for federal tax purposes. By including the entire amount in income as of December 31, 2007, Defendant Brodnik has complied with IRS Notice 2006–33. Because Defendant Brodnik complied with the newly-enacted 26 U.S.C. § 409A and IRS Notice 2006–33, it is improper for the United States to claim that acts which comply with the law are criminal acts." (*Id.*, p. 7.) Dr. Brodnik claims further that even if his acts were not in compliance with the law, he "could not have intended to violate the law by filing the 2007 Form 1040X when the law does not contain clear standards of conduct." (*Id.*) He states that the paragraphs of the Indictment which he would have dismissed "attempt to impose requirements upon Defendant Brodnik that are not required on the face of IRS Notice 2006–33." (*Id.*, p. 8.) Citing *United States v. Critzer*, 498 F.2d 1160 (4th Cir.1974), and *United States v. Mallas*, 762 F.2d 361 (4th Cir.1985), Dr. Brodnik states as follow (*Id.*, p. 10.):

> [C]riminal tax prosecution may not rest on ambiguous tax law. Although Defendant Brodnik maintains that IRS Notice 2006–33 is not ambiguous and that he followed its guidance, even if his interpretation is incorrect, the ambiguity of IRS Notice 2006–33 compels this Court to dismiss paragraphs 45 of Count 1, 2(f) of Count 2, 2(f) of Count 3, 2(f) of Count 4, 2(f) of Count 5, 2(f) of Count 6, and 2(f) of Count 7 of the Indictment be-

cause Defendant Brodnik cannot be prosecuted for allegedly violating ambiguous guidance in IRS Notice 2006–33.

By his Second Motion to Dismiss Indictment in Part (Document No. 94.), Dr. Brodnik requests that the Court dismiss paragraph 45 of Count One, paragraphs 2(f) and (g) [6] of Counts Two through Seven and Paragraphs 2(c) and (d) of Count Eight of the Superseding Indictment. Dr. Brodnik incorporates the claims which he raised in his first Motion to Dismiss the Indictment in Part by reference. (*Id.*, pp. 2 and 6.) He asserts further that the United States included paragraphs 2(f) of Counts Two through Seven of the Superseding Indictment charging him with filing false income tax returns in 2004 and 2005 claiming, among other things, to have been the employee of a Hungarian entity as "an attempt to keep the statute of limitations open for years that would otherwise be closed by the six-year statute of limitations applicable to charges of tax evasion and conspiracy." (*Id.*, p. 7.) Dr. Brodnik states that "there is no further explanation in the Superseding Indictment of why the 2004 and 2005 tax returns are false or otherwise constitute a continuing act, which would keep the statute of limitations open. Claiming to be an employee of a Hungarian company, even if false, would not arise to the level of tax evasion or a continuing act." (*Id.*) Respecting paragraphs 2(c) and (d) of Count Eight of the Superseding Indictment, Dr. Brodnik asserts that "the United States has made an unfounded, unreasonable, and shocking allegation with respect to Defendant Brodnik's attempts to comply with IRS Notice 2006–33. The allegation is so unreasonable that the United States could possess the belief that it will prove this allegation at trial. Instead, the argument could only

---

**6.** The United States added Paragraph 2(f) of the Superseding Indictment and made para-

graph 2(f) of the Indictment paragraph 2(g) of the Superseding Indictment.

be made by the United States for the sole purpose of 'bootstrapping' its Motion to Disqualify Counsel Stientjes. This act and intention of the United States is a violation of the Sixth Amendment." (*Id.*, p. 5.)

By his Supplement to his Second Motion to Dismiss Indictment in Part (Document No. 96.), Dr. Brodnik presents the expert report of Mr. Eric Johnson supporting his positions respecting the United States' allegations.

By his Response to Mr. Kritt's Motion to Dismiss (Document No. 97.), Dr. Brodnik urges the Court to consider Mr. Johnson's expert report, the Senate Committee testimony of Assistant Secretary of the Treasury Pamela Olson, Congress' enactment of 26 U.S.C. § 409A and the IRS' issuance of Notice 2006–33 and cites the Fourth Circuit's decisions in *Mallas* and *Critzer* arguing that they "are illustrative of the rule that criminal tax prosecutions may not rest on ambiguous tax law. The ambiguity of the tax law on which the Superseding Indictment is based compels this Court to dismiss the Superseding Indictment because Defendants cannot be prosecuted for allegedly violating ambiguous tax law." (*Id.*, p. 5.)

By his Motion to Dismiss the Superseding Indictment (Document No. 92.), Mr. Kritt claims as follows:

1. The deferred foreign compensation program at issue in this case cannot give rise to criminal liability because the law is undecided as to the deferred foreign compensation program.

2. Counts Two, Three, Four and Five are time barred by the six-year statute of limitations per 26 U.S.C. § 6531.

3. The Indictment is multiplicitous.

4. The Superseding Indictment was improperly issued for the purpose of making co-Defendant Randy Brodnik's counsel, Robert Stientjes, a witness.

5. The Superseding Indictment was improperly issued for the purpose of saving the six-year statute of limitations, which has already tolled.

6. For such further reasons set forth in Mr. Kritt's memorandum of law in support of this Motion.

In his Memorandum in Support (Document No. 93.), Mr. Kritt quotes allegations from the Indictment and the Superseding Indictment demonstrating how the allegations contained in the Superseding Indictment differ from those in the Indictment. (*Id.*, pp. 2–14.) Mr. Kritt contends as follows (*Id.*, p. 15.):

The Superseding Indictment was issued for the improper purpose of disqualifying Stientjes and attempting to repair the statute of limitations issue. The Superseding Indictment was issued in order to disqualify co-Defendant Dr. Brodnik's counsel, Robert Stientjes, from representing Dr. Brodnik. Its allegations make Mr. Stientjes a necessary witness. However, under the original Indictment, Mr. Stientjes cannot be compelled to be a witness. To remedy this problem, the government improperly superseded the Indictment to allege enough facts to compel Mr. Stientjes to be a witness.

The United States also improperly returned the Superseding Indictment against Mr. Kritt to argue the statute of limitations has not yet run. The addition of Paragraph f to most of the Counts of the Superseding Indictment is a transparent attempt to extend the statute of limitations. This is improper because the statute of limitations has already run, and the United States cannot issue a Superseding Indictment alleging a new last affirmative act in order to save its case.

At the January 7, 2010, hearing, the undersigned inquired respecting Defendants' contention that the law applicable to the employee leasing arrangement and deferred compensation plan is ambiguous. The United States argued that "traditional fraud concepts" apply. (Document No. 106, p. 10.) Counsel for the United States stated that "[i]t's those basic, core, long-standing fraud concepts that underlies the prosecution's theory. Again, we don't need a targeted statute saying foreign deferred compensation employee leasing scams are illegal. We rely on shell entities, fictitious entities, fake contracts, secret bank accounts to hide untaxed money that's sent overseas. That's basic fraud." (*Id.*, p. 52.)

By its Supplemental Memorandum in Support of its Response to Defendants' Motions to Dismiss Indictment Based on Alleged Vagueness of the Tax Laws (Document No. 107.), the United States responds to Defendants' arguments that the law pertaining to their employee leasing and unqualified deferred compensation program was ambiguous citing *United States v. Schmidt*, 935 F.2d 1440 (4th Cir.1991), as establishing the basis for considering the issue and asserting basically that "[t]he proper focus of the Court's attention is on well-settled law on what constitutes tax evasion and not the misty realm of purported 'foreign deferred compensation programs' implemented through sham foreign employee arrangements." (*Id.*, p. 15.) The United States claims that "[a]mple, long-standing, unambiguous criminal and civil law—coupled with the authoritative force of plain common sense—served as notice to the Defendants of the illegality of their tax scheme." (*Id.*, p. 17.) The United States argues essentially that the Senate Committee testimony of Assistance Secretary of the Treasury Pamela Olson and the enactment of 26 U.S.C. § 409A are not the proper focus in considering whether the law applicable to Defendant's pro-

gram was ambiguous. Rather, the United States urges that "[t]his case is governed by *Schmidt*. The pertinent tenets of tax law governing this scheme are well-settled and clear." (*Id.*, p. 31.)

### DISCUSSION

■ Defendants contend that the tax law at the time they developed their employee leasing and unqualified deferred compensation program was unclear, vague and ambiguous and remained so until approximately 2003 when the IRS began issuing Notices, Assistant Treasury Secretary Pamela Olson testified and Congress enacted 26 U.S.C. § 409A. They assert that they therefore cannot be held to have had the requisite intent to violate it. The United States cites basic tenets of tax law claiming that they were well established when Defendants developed their program.

"It is settled that when the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it." *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir.1974). "Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal." *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir.1985). Statutes and regulations must therefore provide "fair warning" that certain conduct will result in criminal prosecution. *Id.*, at 364–365. "In the absence of explicit language in the regulation, potential liability might alternatively be announced by 'authoritative constructions sufficiently illuminating the contours of an otherwise vague prohibition[.]'" *Id.*, at 364, quoting *Dombrowski v. Pfister*, 380 U.S. 479, 490–91, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). The Court stated further in *Mallas*, 762 F.2d at 364 (Citations omitted), that "[w]e recognize

that due process does not require the prosecution to cite a 'litigated fact pattern directly on point[.] * * * We are accordingly open to the government's suggestion that a duty not articulated by regulatory action or judicial construction may nonetheless be compelled by the authoritative force of common sense."

▮▮▮ "The uncertainty of a tax law, like all questions of vagueness, is decided by the court as an issue of law." *United States v. Mallas,* 762 F.2d at 364, fn. 4. When ambiguity of the law is raised in a tax evasion case, the question presented is whether by virtue of the statutes, regulations or their construction or by force of common sense, the defendant had fair warning that his alleged conduct constituted tax evasion. Applying this to this case, the question presented is whether Defendants had fair warning that their use of domestic and foreign entities in the employee leasing and deferred compensation program to transfer Dr. Brodnik's earnings into offshore accounts constituted income tax evasion, i.e., the concealing of Dr. Brodnik's income in a fraudulent manner. The Court's focus is upon "pertinent tenets of tax law—that earned income is taxable to those who earn it and that dominion and control over property, rather than documentary title, determines to whom the income from the property is taxable." *United States v. Schmidt,* 935 F.2d 1440, 1448 (4th Cir.1991), abrogation with respect to a Sentencing Guideline issue recognized in *United States v. Delfino,* 510 F.3d 468, 472 (4th Cir.2007). Akin to the latter tenet is the fundamental principle of tax law that "income is taxable as constructively received when it is first available for the free and unrestricted use of the designated recipient, and this power to dispose of income as he wishes results in income to the holder of the power. When exercised to direct the payment of income to a third person, the existence of such power is clearly demonstrated." *Hicks v.*

*United States,* 314 F.2d 180, 185 (4th Cir. 1963). It is further well established that while it is entirely appropriate for a taxpayer to endeavor to minimize or avoid paying taxes through corporations and arms length contractual relationships, the corporate form or structure and the contracts defining the relationships must have some substance. *See Lerman v. C.I.R.,* 939 F.2d 44, 54 (3rd Cir.1991)("The basic rule of law is that taxation is based upon substance, not form."); *Haag v. C.I.R.,* 88 T.C. 604, 610–614, 1987 WL 49288(1987), aff'd, 855 F.2d 855 (8th Cir.1988)(Doctor assigned his interest in a medical partnership to a professional services corporation which he created under State law. The Tax Court concluded that the arrangement was legitimate because "an effective employment agreement existed between [the doctor] and the [professional services corporation]; [the partnership] recognized [the professional services corporation] as the entity through whom [the doctor] provided medical services; and the medical partnership interest could be transferred to a corporation under [State] law."); *Keller v. C.I.R.,* 77 T.C. 1014, 1031, 1981 WL 11340 (1981), *aff'd,* 723 F.2d 58 (10th Cir. 1983)(The Tax Court found a pathologist's professional services corporation legitimate stating that "[t]he policy favoring the recognition of corporations as entities independent of their shareholders requires that we not ignore the corporate form so long as the corporation actually conducts business.") Thus, in *Sargent v. C.I.R.,* 929 F.2d 1252 (8th Cir.1991), which Defendants cite urging that the employee leasing arrangement allegedly created and administered by Mr. Kritt in this case bears some resemblance to the personal service corporation arrangements in issue in *Sargent,* the Court considered whether the United States Tax Court properly determined that two professional hockey players should be taxed upon amounts with-

held from their wages for their qualified pension plans as employees by their personal service corporations rather than the team for which they played. The Court explained that in order for the personal service corporation arrangement to have validity as follows (*Id.*, at 1256 (Citations omitted)):

> First, the service-provider must be just that—an employee of the corporation whom the corporation has the right to direct or control in some meaningful sense. * * * Second, there must exist between the corporation and the person or entity (Club) using the services a contract or similar indicium recognizing the corporation's controlling position.

The Court found "ample Tax Court precedent which upholds the sanctity of contractual relations between taxpayers and their respective personal service corporations." *Id.*, at 1258. The Court stated that "[e]ach time the legitimacy of the employee's relationship with the corporation was raised, the Tax Court pointed to the existence of a contractual relationship between the corporation and the employee/service-provider as the rationale for upholding the legal significance of the PSC." *Id.* The Court would not consider what motivated the taxpayers to create personal service corporations stating that "[t]he Code provisions relating to qualified retirement plans are a deliberate congressional bestowal of benefits upon employers and employees; efforts to obtain the advantage of these benefits, by way of conducting business in the corporate form, are not to be deemed to render the taxpayer culpable of illegal tax avoidance or evasion." *Id.*, at 1260. The Court stated further as follows (*Id.*):

Unfortunately, taxpayers will often go to great lengths to evade unlawfully the payment of income taxes. Whether it simply be lying on their tax forms, assigning income to those who have not earned it, or sheltering income in nonexistent or improper tax-avoidance investments, each is destructive to the often painful revenue-production responsibility of the IRS. In this case, however, we are presented with taxpayers who have fulfilled each and every task required of them in order to become properly incorporated. More importantly, for purposes of this case, Appellants took steps to insure that each was a contractually-bound employee of his respective PSC. That these contracts of employment were recognized and respected by the [team for and league within which they played] lends substantial credibility to the fact that Appellants were employees of their respective PSCs—and not the [team].

The Court's decision in *Sargent* is useful only insofar as it exemplifies how basic tenets of tax law apply in a case arguably somewhat like the instant case.

The allegations contained in the Superseding Indictment are clearly premised upon fundamental principles of tax law. They charge essentially that Defendants engaged in "an elaborate 'employee leasing' scheme" by entering sham contracts, creating domestic and foreign shell entities and utilizing those entities to divert Dr. Brodnik's income into offshore accounts nominally under a "non-qualified deferred compensation plan." [7] They further charge that Dr. Brodnik took "loans . . . so that [he] could use these funds to build a mansion in Bluefield, West Virginia" (Doc-

---

7. Pursuant to 26 U.S.C. § 3121(v)(2)(c), "the term 'non-qualified deferred compensation plan' means any plan or other arrangement for deferral of compensation other than a plan described in subsection (a)(5)." 26 U.S.C. § 3121(a)(5) provides that payments made to qualified trusts, annuities and individual retirement accounts are not included in wages.

ument No. 66, Count One ¶ 8.), Defendants created "lines of credit" (*Id.*, Count One ¶¶ 21, 31.) to Dr. Brodnik and his wife upon the accounts and finally arranged for the withdrawal of approximately 2.2 million dollars of the funds to pay taxes upon them as the United States was conducting its investigation (*Id.*, Count Eight ¶ 2.d.). The allegations implicate the well-established tenets of tax law discussed above. The United States is contending that the entities which Defendants created existed in form only and had no substantial and independent dominion or control over Dr. Brodnik as an employee leased to BWC or the funds diverted into offshore accounts. The United States is contending further that Dr. Brodnik had access to and control of the funds and therefore constructive receipt of them. Following the direction of the Fourth Circuit in *Schmidt,* the undersigned finds that basic tax law applicable to Defendants' conduct as alleged in the Superseding Indictment was clear and well defined well before Defendants engaged in it. The undersigned finds Defendants' assertions respecting the IRS Notices, the testimony of Assistant Secretary of the Treasury Pamela Olson and Congress' enactment of 26 U.S.C. § 409A unpersuasive. The issuance of the Notices and enactment of the statute do not evidence a change in or clarification of the law pertaining to employee leasing arrangements and unqualified deferred compensation plans as Defendants urge. Rather, IRS Notice 2003–22 notifies taxpayers involved in foreign employee leasing arrangements that the IRS views such arrangements as "designed to circumvent longstanding legal principles to enable

Taxpayer and Service Recipient Corporation to avoid or evade income and employment taxes." IRS Notice 2006–33 notifies taxpayers involved in legitimate nonqualified deferred compensation plans respecting their obligations following the enactment of 26 U.S.C. § 409A. As the IRS indicated in its Notice 2003–22, "longstanding legal principles" applied to employee leasing arrangements, and the IRS gave further "fair warning" of it. Finally, Defendants would have the Court assume that their non-qualified deferred compensation plan, a significant benefit to Dr. Brodnik under the foreign employee leasing arrangement, was legitimate such that 26 U.S.C. § 409A applied. The United States contends that the deferred compensation plan was not legitimate and was created to evade the payment of income taxes. Whether Defendants' non-qualified deferred compensation plan was legitimate or was created to evade the payment of income taxes is a question of fact for a jury. For all of the foregoing reasons, the Defendants' Motions to Dismiss must be denied.[8]

### B. The United States' Motion to Disqualify Dr. Brodnik's Counsel, Mr. *Robert J. Stientjes, Due to Conflict of Interest. (Document No. 49.)*

The United States asserts that "[a] central fact at trial will be Defendant Brodnik's ability to control and access the millions of untaxed dollars he sent offshore." (Document No. 49, p. 2.) The United States claims that "[i]n 2005, Brodnik ... retained Robert Stientjes ... to represent him in this criminal matter. Mr. Stientjes

---

8. The undersigned considered Mr. Kritt's assertions that certain counts of the Indictment should be dismissed based upon the applicable statute of limitations and the Indictment is multiplicitous in Proposed Findings and Recommendation filed on November 19, 2009, 2009 WL 6567103. (Document No. 79.).

The undersigned has considered Mr. Kritt's further assertions in these regards in claiming that the Superseding Indictment should be dismissed and finds them without merit for essentially the same reasons as stated in the November 19, 2009, Proposed Findings and Recommendation.

met with counsel for the United States once in Charleston, once in Washington, D.C. during the course of the grand jury investigation, and had intermittent telephone and written communications with counsel for the United States." (*Id.*, pp. 3–4.) The United States further claims that in 2007, Mr. Stientjes replaced Mr. Kritt as Dr. Brodnik's financial advisor and Mr. Stientjes "perpetuated the charade engineered by Kritt." (*Id.*, p. 4.) Specifically, the United States claims that in 2008 Mr. Stientjes corresponded with representatives of foreign entities which held and managed Dr. Brodnik's untaxed income. Quoting an e-mail which Mr. Stientjes sent, the United States states that Mr. Stientjes requested " 'the entity that now holds the liability under the deferred compensation arrangement to modify the arrangement to allow for a partial accelerated payment equal to the tax liability that must be paid by Dr. Brodnik before June 15, 2008.' " (*Id.*, pp. 4–5.) The foreign entity holding Dr. Brodnik's funds, Blenheim, sent Mr. Stientjes 2.2 million dollars, and most, but not all, of that amount was paid to the IRS. The United States contends that Mr. Stientjes then drafted a "Distribution Agreement" covering the disbursement "and sent it to Blenheim even though Blenheim had already sent the bulk of the $2.2 million to Mr. Stientjes." (*Id.*, p. 6.) The United States asserts that these circumstances amount to "powerful evidence of Defendant Brodnik's control of and access to his 'deferred compensation' and evidence of Mr. Stientjes' attempt to further his client's scheme." (*Id.*)[9] The United States states that Mr. Stientjes represents a South Dakota doctor who participated in an employee-leasing scheme which Mr. Kritt sponsored and is being investigated. (*Id.*, p. 7.)[10]

The United States claims that Mr. Stientjes has an actual conflict of interest because he may be called as a witness in this case. (*Id.*, p. 8.) The United States claims that Mr. Stientjes also has a potential conflict of interest through his representation of the South Dakota doctor because the United States has thought that it might seek the South Dakota doctor's cooperation against Mr. Kritt and then Mr. Kritt's cooperation against Dr. Brodnik.

9. The Court notes that the circumstances which are the basis for the United States' Motion to Disqualify—Defendant Brodnik's 2008 request for and receipt of funds from Blenheim to pay income taxes upon the funds held under the foreign deferred compensation plan—were not alleged in the Indictment. Rather, the United States charged that the last overt and affirmative act of evasion occurred on October 15, 2008, when Defendant Brodnik submitted an amended personal income tax return for 2007 falsely describing money which he had earned and placed in offshore accounts. (Document No. 1 (Indictment) at Count One ¶ 45 and Counts Two through Seven ¶ 2(g); *See also* Document No. 47, pp. 18–19.) The circumstances are, however, alleged in Count Eight ¶ 2(d) of the Superseding Indictment (Document No. 66.) as one of the ways in which Defendant endeavored to and "did corruptly obstruct and impede, the due administration of the internal revenue laws. . . ."

10. The United States has attached as Exhibits to its Motion a copy of the Expert Opinion of Robert L. Sommers (Exhibit A), e-mail correspondence from December, 2007, to November, 2008, between Mr. Stientjes and representative of foreign entities administering Dr. Brodnik's accounts respecting Dr. Brodnik's payment upon loans which he had apparently taken, his request for a disbursement of the funds for payment of his "tax liability" and the Distribution Agreement (Exhibit B), correspondence between the United States' counsel, Ms. Forbes, and Mr. Stientjes respecting Mr. Stientjes' representation of the South Dakota physician (Exhibit C), and an August 20, 2009, letter from Ms. Forbes to Mr. Stientjes requesting that Mr. Stientjes voluntarily withdraw from representing Dr. Brodnik or explain why he should not be disqualified from representing him (Exhibit D).

(*Id.*)The United States cites Rules 3.7 and 1.7 of the West Virginia and ABA Model Rules of Professional Conduct [11] and *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988), *United States v. Basham,* 561 F.3d 302, 321–325 (4th Cir.2009); *United States v. Urutyan,* 564 F.3d 679, 687 (4th Cir. 2009) and *United States v. Howard,* 115 F.3d 1151 (4th Cir.1997) in supporting of its position. (*Id.,* pp. 9–13.) The United States states further as follows (*Id.,* pp. 14–15.):

> Disqualification is appropriate because: 1) evidence of Mr. Stientjes's repatriation of Defendant Brodnik's money from a secret offshore account is highly relevant and admissible evidence; 2) no substantial hardship on Defendant Brodnik will result since trial of this matter is not scheduled until November 2009 and because it is understood that Mr. Stientjes does not intend to function as lead trial counsel; 3) the Judiciary and the Department of Justice have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them; 4) the possibility that Defendant Brodnik will raise a reliance defense mid-trial and blame Mr. Stientjes for giving poor legal advice and thereby cause a mis-trial; and 5) the likelihood that Defendant Brodnik will challenge any conviction on the claim of ineffective assistance of counsel or some related theory.

By his Objection to the United States' Motion to Disqualify Counsel (Document No. 51.), Dr. Brodnik states that in 1998 on the advice of Mr. Kritt he entered into an employee leasing arrangement under which he became an employee of an Irish entity and began participating in a foreign deferred compensation program. (*Id.,* p. 2.) In doing so, Dr. Brodnik explains, he was taking advantage of a provision in a Treaty between the United States and Ireland under which his income as received by the Irish entity was taxed in Ireland at a much lower rate than it would have been taxed in the United States and the after-tax amounts were then paid into the deferred compensation plan. (*Id.,* pp. 2–3.) Dr. Brodnik explains that "[t]his deferred compensation plan is treated for U.S. tax purposes as a 'Non–Qualified Deferred Compensation Plan,' as defined by 26 U.S.C. §§ 409A and 3121. At the time when the deferred compensation plan was created, the amounts used to fund the deferred compensation plan were not immediately taxable to Dr. Brodnik and only became taxable in the U.S. when those amounts were actually paid to Dr. Brodnik in the future. Dr. Brodnik participated in the foreign employee leasing program from 1998–2003." (*Id.,* p. 3.) Apparently, Dr. Brodnik is contending that he believed that the employee leasing arrangement and foreign deferred compensation program were legal and presented an attractive and significant opportunity to defer taxes upon income for the years until he retired. Dr. Brodnik states, however, that

---

**11.** ABA Model Rule of Professional Conduct 1.7 prohibits a lawyer's representation of a client when a conflict of interest is presented through the lawyer's concurrent representation of another client, a former client, a third person or a personal interest. ABA Model Rule of Professional Conduct 3.7(a) provides as follows:

(a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless:
> (1) the testimony relates to an uncontested issue;
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
> (3) disqualification of the lawyer would work substantial hardship on the client.

in 2003, Ms. Pamela Olson, Assistant Secretary of the Treasury, requested in testifying before Congress that Congress prohibit deferring the payment of taxes through foreign deferred compensation plans. (*Id.*) Dr. Brodnik states that in 2004 Congress enacted 26 U.S.C. § 409A requiring that all amounts previously deferred under foreign deferred compensation plans be included in income. He states that the IRS then issued IRS Notice 2006–33 requiring that all amounts deferred under foreign deferred compensation plans be reported as income in 2007 federal income tax returns.[12] Dr. Brodnik claims that in compliance with these requirements he reported all of the funds held under the deferred compensation plan in his 2007 federal income tax return and paid federal income tax and interest upon the funds in the amount of $2,021,224.32 in 2008. (*Id.*, pp. 3–4.) Dr. Brodnik states that Mr. Stientjes began communicating in June, 2008, with representatives of the foreign employee leasing company about the requirement that Dr. Brodnik pay taxes upon the funds held under the foreign deferred compensation plan and made arrangements through an attorney for the company, Mr. James Jantos, for the disbursement. (*Id.*, pp. 4–5.) Dr. Brodnik

claims that the Distribution Agreement resulted from negotiations between Mr. Stientjes and Mr. Jantos and "[t]he foreign employee leasing company would not have made any distribution to Robert Stientjes, on behalf of Randy Brodnik, without first having obtained copies of the final Distribution Agreement and Escrow Agreement—executed by Randy Brodnik." (*Id.*, pp. 5–6.). Dr. Brodnik states that he learned that he was a target of an IRS criminal investigation in 2003 and retained Mr. Stientjes as his criminal tax counsel in June, 2005. Dr. Brodnik retained Mr. Kritt as a business consultant and accountant until May, 2007, and then employed the accounting and consulting firm of Clark, Schaefer, Hackett & Co. (*Id.*, p. 8.) Dr. Brodnik states that "Robert Stientjes has only provided legal services to Defendant Brodnik, which are directly related to criminal tax defense in the case at hand." (*Id.*, pp. 8–9.) Dr. Brodnik states further that Mr. Stientjes represented a South Dakota doctor between June, 2005, and March, 2007, and communicated with the Assistant United States Attorney assigned to the doctor's case in 2006. Thus, Dr. Brodnik states, the United States was aware that Mr. Stientjes was representing the doctor then.[13] Dr. Brodnik contends

**12.** On May 5, 2003, the IRS published IRS Notice 2003–22 (2003 WL 1786830) alerting "taxpayers and their representatives that the tax benefits purportedly generated by [offshore employee leasing and deferred compensation] arrangements are not allowable for federal income or employment tax purposes." The notice further indicated that taxpayers participating in such arrangements could become subject to investigation and penalties. On March 21, 2006, the IRS published IRS Notice 2006–33 providing transition relief for offshore trusts and other nonqualified deferred compensation arrangements under 26 U.S.C. § 409A(b) by allowing employers until December 31, 2007, to comply with Section 409A(b).

**13.** Dr. Brodnik has attached as Exhibits to his Objection a copy of the April 8, 2003, testimony of Pamela F. Olson, Assistant Secretary of the Treasury, before the Committee on Finance of the United States Senate (Exhibit 1.), June, 2008, emails and correspondence between Mr. Stientjes and representatives of Blenheim regarding a change in the law requiring that Defendant report and pay taxes upon funds which Blenheim held and requesting a modification of the deferred compensation plan allowing for a disbursement of funds in order to pay the taxes(Exhibit 2.); June 13, 2008, email from representative of Blenheim to Mr. Stientjes indicating agreement to a disbursement of funds for payment of income taxes and receipt of a draft *Distribution Agreement* (Exhibit 3.); a June 11, 2008, email from Mr. Stientjes to representatives of

that Mr. Stientjes should not be disqualified citing standards drawn from decisions of West Virginia Courts in civil cases. (*Id.*, pp. 10–15.) Dr. Brodnik further refers to Rules 1.7 and 3.7 of the West Virginia Rules of Professional Conduct contending that Mr. Stientjes' disqualification would create a substantial hardship for him because Mr. Stientjes has considerable experience as an attorney in representing clients charged with similar offenses. (*Id.*, pp. 15–17.) Finally, Dr. Brodnik argues that Mr. Stientjes' representation of the South Dakota doctor ended on March 15, 2007, and there can therefore be no basis for disqualification arising out of Mr. Stientjes' joint representation of Dr. Brodnik and the South Dakota doctor. (*Id.*, pp. 17–18.)

By its Response to Dr. Brodnik's Objection to its Motion to Disqualify Mr. Stientjes (Document No. 57.), the United States asserts that in his Objection Dr. Brodnik "acknowledges all facts pertinent to this Court's determination of the issues raised by the United States...." (*Id.*, p. 2.) The United States states that Dr. Brodnik acknowledges that he participated in an offshore employee-leasing scheme and the deferred compensation plan as he believed was in conformity with the tax laws at the time and in 2008, Mr. Stientjes obtained the disbursement of over two million dollars from the plan. (*Id.*) The United States then states that "[w]ith no factual issues in dispute, the issue then is one of

relevance of these facts to the issues at trial. These facts are material to the prosecution of defendants Brodnik and Kritt because they prove that the defendants' [offshore employee-leasing] scheme was nothing other than an illegal and elaborate tax evasion scheme." (*Id.*) Citing decisions of the United States Supreme Court and Tax Court including *Foxworthy, Inc. v. Commissioner*, a recent Tax Court decision considering an offshore employee-leasing scheme and deferred compensation plan very similar to the alleged scheme and plan in the instant matter, the United States contends that Mr. Stientjes' obtaining of the payment of more than two million dollars from Dr. Brodnik's Blenheim account indicates that Dr. Brodnik had access to and control over the funds and was in constructive receipt of them all along.

At the September 15, 2009, hearing, the United States reiterated that Mr. Stientjes' actions in June and October, 2008, in requesting and obtaining the disbursement from Dr. Brodnik's foreign account for his payment of taxes upon the funds held under the deferred compensation plan evidence that Dr. Brodnik had access to and control over the funds. Counsel for the United States stated as follows (Document No. 63, pp. 11–12.):

But perhaps the most powerful evidence of Dr. Brodnik's unfettered control of these offshore funds, and certainly the

Blenheim with a proposed Partial Modification and Distribution Agreement and October, 2008, emails between Mr. Stientjes, Mr. Jantos and representatives of Blenheim respecting, among other things, tax provisions and the Distribution Agreement (Exhibit 4.); October 14, 2008, emails from Mr. Stientjes to Mr. Jantos regarding the Distribution Agreement as Dr. Brodnik had signed it, an updated version of it and an Escrow Agreement as Dr. Brodnik signed it making Mr. Stientjes' firm escrow agent for purposes of receiving and paying Dr. Brodnik's taxes upon the

funds as he had held them overseas (Exhibit 5.); October 22 and November 6 letters to the IRS indicating hand delivery of Cashiers Checks for Dr. Brodnik's payment of $2,021,224.32 to the U.S. Department of Treasury and a March 5, 2009, letter to the Virginia Department of Taxation indicating Dr. Brodnik's payment of $226,793.29 (Exhibit 6.); and a November 20, 2006, letter from Mr. Stientjes to Dr. Brodnik and the South Dakota doctor discussing the potential for conflicts of interest in representing them (Exhibit 7.).

most recent evidence, is Rob Stientjes' conduct, beginning in June of 2008 and continuing on through I think November of 2008, just several months before indictment in this case. And it's this conduct that is the subject of the United States' motion to disqualify Mr. Stientjes. Mr. Stientjes, by interacting with Blenheim and heading up this second repatriation effort ... has made himself a witness in this criminal case. He took off his criminal defense attorney hat and put on the hat that had been previously worn by Anthony Kritt." The United States insinuated that the reason Mr. Stientjes went forward with the distribution in October, 2008, was because an IRS criminal investigator, Mr. Robert Lanham, interviewed Blenheim representatives between October 5 and 9, 2008, and learned that Mr. Stientjes was working to obtain the disbursement. (*Id.,* pp. 13–14.) Counsel for the United States stated that "[t]he materiality of Mr. Steintjes' conduct in the repatriation of the money ... is evident in this case." (*Id.,* p. 15.) Counsel stated further that "the e-mail transactions, the e-mail documents in this case between Mr. Stientjes and the various Blenheim folks, are going to be admissible at trial as party admissions. These are basically admissions by Dr., Brodnik's agent, Mr. Stientjes. Those exhibits will be in front of the jury, and they are going to be seeing this and they are going to be looking at Rob Stientjes. Rob Stientjes, he's right there. So he is basically an unsworn witness at trial." (*Id.,* p. 16.)

Mr. Stientjes argued that the circumstances respecting the 2008 disbursement from Dr. Brodnik's foreign account with Blenheim are not material. He stated that "I did what I did to assist the defendant to comply with the change in the law that was

intertwined with the defense of Dr. Brodnik. You cannot separate the two and say that I put on one hat and took off another. I think it would be malpractice if I didn't do what I did in negotiating the modification of the deferred compensation plan in order to comply with 409A." (Document No. 63, p. 25.) Mr. Stientjes stated that the Distribution Agreement was required, negotiated and finalized eight days before the funds were disbursed to pay the taxes. (*Id.,* pp. 26–27.) Mr. Stientjes argued further that "to have done what was necessary to comply with the change in the law cannot be construed as being prejudicial to defendant Brodnik." (*Id.,* p. 27.)

Counsel for the United States responded respecting Mr. Stientjes' claim that he was acting in compliance with Section 409A that "[t]he law was trying to keep up with the scams, Your Honor. 409A came in, and it only applies to valid deferred compensation plans. * * * You don't get to apply 409A if it's not a valid plan. This is not a valid plan. And I do believe that's an issue that is material and one that the Court needs to decide." (Document No. 63, p. 31.) Counsel also raised the possibility that Dr. Brodnik might claim advice of counsel as a defense (*Id.,* p. 34.) and, if Mr. Stientjes is not disqualified, he would be "an unsworn witness who is playing the role of a criminal defense attorney." (*Id.,* p. 38.) [14]

### DISCUSSION

"[T]he right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment...." *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). The right is conditional, however, and may be administered

14. Mr. Kritt has not taken any position respecting calling Mr. Stientjes as a witness.

(Document No. 106, p. 51.)

by the Court. "[T]rial courts, when alerted by objection from one of the parties, have an independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment." *Wheat v. United States*, 486 U.S. at 161, 108 S.Ct. at 1698. "The District Court must recognize a presumption in favor of [defendant]'s counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Wheat v. United States*, 486 U.S. at 164, 108 S.Ct. at 1700.[15] "[T]he district court must be allowed substantial latitude ... not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat v. United States*, 486 U.S. at 163, 108 S.Ct. at 1699. "To meet [its] obligation, a court that learns of a possible conflict 'must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all.'" *United States v. Rogers*, 209 F.3d 139, 143 (2nd Cir.2000), *quoting United States v. Levy*, 25 F.3d 146, 153 (2nd Cir. 1994). An actual conflict of interest exists when an attorney's and a defendant's interests are divergent with respect to a material factual or legal issue or a course

of action. *Cuyler v. Sullivan*, 446 U.S. 335, 356, 100 S.Ct. 1708, 1722, 64 L.Ed.2d 333 (1980)("An actual conflict of interest negates the unimpaired loyalty a defendant is constitutionally entitled to expect and receive from his attorney."); *United States v. Blau*, 159 F.3d 68, 74 (2nd Cir. 1998), and *United States v. Levy*, 25 F.3d at 155, *quoting Winkler v. Keane*, 7 F.3d 304, 307 (2nd Cir.1993); *see also United States v. Gonzalez*, 105 F.Supp.2d 220, 222–223 (S.D.N.Y.2000)("An actual conflict is one that is so 'severe' that 'no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation.'" *quoting United States v. Levy*.) "An attorney has a potential conflict of interest if the interests of the defendant *could* place the attorney under inconsistent duties in the future." *United States v. Jones*, 381 F.3d 114, 119 (2nd Cir.2004), citing *United States v. Kliti*, 156 F.3d 150, 153 fn. 3 (2nd Cir.1998); *United States v. Perez*, 325 F.3d 115, 125 (2nd Cir.2003)("If the court discovers no genuine conflict, it has no further obligation. At the other end of the spectrum, if the court determines that counsel has an actual conflict that is so severe as to indicate per se that the rendering of effective assistance will be impeded, or is analogous to such a conflict in 'breadth and depth', the court must ... disqualify counsel. And if, between these two extremes, the court determines that the 'attorney suffers from a lesser [actual] or only a potential conflict,' then it may accept a defendant's knowing and intelligent waiver of his right to conflict-free counsel and permit the defendant to be

---

15. Justices Marshall and Brennan emphasized in their dissent in *Wheat*, 486 U.S. at 166, 108 S.Ct. at 1701 (footnote omitted), that a conflict must be severe to warrant disqualification as follows:

> As the Court states ..., the trial court must recognize a presumption in favor of a defendant's counsel of choice. This presumption means that a trial court may not reject

a defendant's chosen counsel on the ground of a potential conflict of interest absent a showing that both the likelihood and the dimensions of the feared conflict are substantial. Unsupported or dubious speculation as to a conflict will not suffice. The Government must show a substantial potential for the kind of conflict that would undermine the fairness of the trial process.

represented by the attorney of his choice." (Citations omitted.)).[16]

■ Disqualification may also be appropriate though no conflict of interest exists but circumstances indicate that the attorney has "first-hand knowledge of the events presented at trial." *United States v. Locascio*, 6 F.3d 924, 933 (2nd Cir.1993). Thus, a defendant's attorney may be disqualified when the attorney might be called as a witness for the defendant or be an unsworn witness for the defendant at trial. *United States v. Locascio*, 6 F.3d at 934 ("When an attorney is an unsworn witness ..., the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired. Waiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced."); *United States v. Kliti*, 156 F.3d 150, 156 (2nd Cir.1998)("When faced with an attorney as a sworn or an unsworn witness, the proper recourse is to disqualify the attorney, not to exclude the testimony.") "[D]isqualification is a drastic remedy to the unsworn witness problem." *United States v. Locas-*

*cio*, 6 F.3d at 934. In *United States v. Evanson*, 584 F.3d 904 (10th Cir.2009), the United States charged Mr. Evanson, an attorney, and others with conspiring to commit tax fraud, tax evasion and aiding and assisting in preparing false income tax returns. Mr. Evanson and the others established companies which dealt in insurance and real estate. Participants bought policies and real estate and held accounts and interests in the companies and took loans and claimed personal and business income tax deductions. It appears that Mr. Evanson hired Mr. Wheeler to represent him prior to the filing of the Indictment while the United States was conducting its investigation. Ten months after the Indictment was filed, the United States moved to disqualify Mr. Wheeler claiming that Mr. Wheeler was actually involved in and/or had advised Mr. Evanson as Mr. Evanson dealt with participants who had learned of the federal investigation and wanted their money back. The United States urged that communications, two letters and an email, between Mr. Evanson and the participants were misleading and intended as a coverup and indicated Mr.

---

**16.** As the United States indicates in its Motion to Disqualify (Document No. 49.), the Fourth Circuit Court of Appeals has considered District Courts' disqualification of defense counsel in several decisions. *United States v. Basham*, 561 F.3d 302, 321–325 (4th Cir.2009)(In a case of carjacking and kidnapping resulting in death, Defendant's attorney's disqualification was appropriate because· statements made by Defendant's attorney to investigators of an evidentiary nature made the attorney a potential witness at trial. Additionally, the right to counsel of one's choice is not implicated in the case of an indigent Defendant represented by a Court-appointed attorney.); *United States v. Urutyan*, 564 F.3d 679, 687 (4th Cir.2009)(Defense counsel's payment by a third-party who was a member of the alleged criminal enterprise which engaged in bank fraud and identity theft for representing defendant created "a serious potential for conflicts of interest."); *United States v. How-*

*ard*, 115 F.3d 1151, 1155–1156 (4th Cir.1997)(Disqualification of defendant's attorney based upon a conflict of interest was appropriate where the attorney had represented defendant's superiors in a drug organization and there was a possibility that the attorney might be called to testify at trial respecting a factual issue arising out of the attorney's representations.); *United States v. Williams*, 81 F.3d 1321, 1324–1325 (4th Cir. 1996)(The District Court had discretion to disqualify attorney who represented defendant's wife and later, after Defendant's wife was not indicted, represented defendant indicted upon charges of bank fraud and aiding and abetting rather than allow defendant to employ an auxiliary attorney to cross examined defendant's wife at trial as the United States Magistrate Judge envisioned.) These decisions are based upon factual circumstances quite different from those presented in this case.

Evanson's knowledge that the scheme was unlawful. The United States urged therefore that Mr. Wheeler was a potential witness at trial with respect to Mr. Evanson's willfulness to commit the charged offenses. The United States Magistrate Judge denied the United States' motion to disqualify Mr. Wheeler reasoning that Mr. Wheeler would be restricted in testifying by the attorney-client privilege and disqualifying attorneys at the trial stage who assist defendants in the investigative stage restricts defendants in their choice of counsel. The United States appealed the Magistrate Judge's decision to the District Court, and the District Court reversed the Magistrate Judge's ruling and disqualified Mr. Wheeler finding that communications between Mr. Evanson and the participants were admissible at trial and Mr. Wheeler might be called to testify about them either as a witness for Mr. Evanson indicating that they were prepared as he advised, for the United States as a rebuttal witness or for a co-defendant. Mr. Evanson was convicted and sentenced and appealed claiming that the District Court's disqualification of Mr. Wheeler violated his Sixth Amendment right to counsel of his choice. The Tenth Circuit affirmed. The Court focused upon the two letters which Mr. Evanson had sent to participants as presenting the potential for conflict of interest and unsworn witness problems and found that "[t]he district court could reasonably anticipate that the letters would be offered into evidence, and admitted, at trial." *United States v. Evanson,* 584 F.3d at 912–913. Addressing Mr. Evanson's assertion that the letters indicated Mr. Wheeler's advice respecting how he and the participants could comply with their tax obligations, the Court stated as follows:

> We question Mr. Evanson's characterization of the letters. Much of their content was devoted to assertions about how various transactions between the participants and Mr. Evanson's companies had been handled. In particular, they emphasized that the phony loans were legitimate obligations. There is little in their content to suggest that they were the product of advice to Mr. Evanson about how he needed to conform his conduct to the law. They focused on telling participants what their (longstanding) obligations were. In any event such advice is hardly a core component of representing a client in litigation. And assisting in the production of evidence is often beyond the bounds of advocacy.

*United States v. Evanson,* 584 F.3d at 915. The Court considered how the United States intended to use the letters to prove that Mr. Evanson knew that his scheme was unlawful as they "conceal[ed] the true nature of the loans and nominee purchases...." *Id.* at 913. The Court further considered how Mr. Evanson might respond either by contending that the letters evidenced his intentions all along or were prepared based upon Mr. Wheeler's advice. Focusing upon whether Mr. Evanson might make an advice-of-counsel defense, the Court also considered the United States' assertion that one of the letters constituted an unlawful act of obstruction. The Court stated that "[a]n advice-of-counsel defense would implicate Mr. Wheeler in these allegedly unlawful acts." *Id.* The Court further considered the consequences if Mr. Wheeler remained Mr. Evanson's attorney and Mr. Evanson did not assert advice of counsel and did assert it as a defense. *Id.* at 913–914. If Mr. Evanson did not assert the defense, the Court saw potential for Mr. Evanson's claims on appeal and in collateral proceedings that Mr. Wheeler failed to raise the defense at trial and was constitutionally ineffective in representing him. *Id.* If Mr. Evanson raised the defense, "Mr. Wheeler's personal knowledge of the merits of

the defense would engender problems at trial. First, Mr. Wheeler could become an unsworn witness.... * * * Second, by raising an advice-of-counsel defense, Mr. Evanson would waive the attorney-client privilege regarding what advice Mr. Wheeler gave him. * * * This would permit the government to call Mr. Wheeler as a witness to challenge Mr. Evanson's version of events, placing Mr. Wheeler in the untenable position of providing testimony against his client." *Id.,* citations to *Locascio* and other authorities omitted.

The First Circuit Court of Appeals' decision in *United States v. Diozzi,* 807 F.2d 10 (1st Cir.1986), illustrates the peril of disqualifying counsel in an income tax evasion case. Richard and Diane Diozzi retained attorney David Twomey to represent them while the IRS was conducting an investigation into their tax liability for tax years 1978 through 1980 and specifically unreported income from their business. Mr. Twomey hired a certified public accountant to assist him in developing a document which detailed and analyzed the Diozzi's accounting, tax and business practices and concluded that the Diozzis had no criminal intent as taxpayers. Mr. Twomey was also present when the CPA made an oral presentation of the Diozzis' position to the IRS. Mr. Twomey then withdrew as the Diozzis' counsel. Richard Diozzi then retained attorney Kenneth Lehman, and, like Mr. Twomey, Mr. Lehman hired a certified public accountant to assist him. Having examined Mr. Twomey's work and conducted interviews, Mr. Lehman met with representatives of the Justice Department and submitted a document to the Tax Division of the Department of Justice containing factual information which Mr. Twomey had developed and submitted and legal arguments respecting the Diozzis' defenses and violations of their due process rights. Apparently after the Diozzis were indicted, Mr. Lehman convinced Mr. Twomey to join him in representing the Diozzis. Six days before trial, the United States filed a motion to disqualify Mr. Twomey and Mr. Lehman. The United States asserted that Mr. Twomey's and Mr. Lehman's statements to the IRS and the Tax Division were evidence of the Diozzi's scheme to commit tax fraud and consciousness of guilt and Mr. Twomey and the United States would therefore call Mr. Twomey and Mr. Lehman as material witnesses at trial. At a hearing, the Diozzis offered to stipulate to the matters which the United States would offer through the testimony of Mr. Twomey and Mr. Lehman, i.e., the contents of their submissions and the terms and conditions underlying their representation of the Diozzis. The District Court granted the United States motion to disqualify Mr. Twomey and Mr. Lehman. The Diozzis obtained new counsel, and the matter went to trial. The United States called Mr. Twomey and Mr. Lehman to testify, and the Court limited their testimony to the contents of their submissions and matters pertaining to their retention as the Diozzis' counsel. The Diozzis were convicted and appealed claiming that in disqualifying Mr. Twomey and Mr. Lehman the District Court violated their Sixth Amendment right to be represented by counsel of their choice. The Diozzis contended that the District Court erred in disqualifying Mr. Twomey and Mr. Lehman and allowing the United States to call them as witnesses when they offered to stipulate to the information which the United States intended to obtain and did obtain through their testimony. The United States argued that (1) the best way of introducing the statements which the Diozzis made through counsel to the IRS and the Justice Department was through the testimony of Mr. Twomey and Mr. Lehman, (2) even if they were not called to testify at trial, ethical rules required Mr. Twomey's and Mr. Lehman's disqualification as "unsworn witnesses" whose credibility would be in issue

at trial and (3) the Diozzis were not prejudiced by the disqualification of their counsel. The Court of Appeals rejected the United States' arguments. The Court indicated that a stipulation of evidence which the United States would have sought through the testimony of Mr. Twomey and Mr. Lehman was an adequate alternative method of proof. Respecting the United States "unsworn witness" theory that disqualification was warranted because Mr. Twomey and Mr. Lehman would have questioned witnesses and presented argument at trial intending to prove that the Diozzis' statements made through them in their submissions to the IRS and the Justice Department were true, the Court stated that "[d]efense counsel cannot be subject to disqualification merely for arguing their clients' positions on statements that are in evidence." *United States v. Diozzi*, 807 F.2d at 14. The Court stated further that "[d]efense counsel cannot be subject to disqualification merely for having represented their clients in a preindictment investigation. In this case, defense counsel's express or implied arguments at trial regarding the [Diozzis'] statements would have been no more testimonial than any other lawyer's examination of witnesses or summation to the jury." *United States v. Diozzi*, 807 F.2d at 14–15. Finally, the Court rejected the United States' contention that the Diozzis were not prejudiced by the disqualification of Mr. Twomey and Mr. Lehman as the United States had the heavy burden of establishing that their disqualification was justified and "[t]he Supreme Court has never held that prejudice is a prerequisite to reversal of a conviction for violation of the sixth amendment right to counsel of choice." *United States v. Diozzi*, 807 F.2d at 16 fn. 11. The Court therefore concluded that "the disqualification order ... is unconstitutional error requiring us to set aside [the Diozzis'] convictions." *United States v. Diozzi*, 807 F.2d at 16.

It is generally clear from *Diozzi* that a Court should consider whether there are any alternatives to disqualification such as the stipulation of the facts underlying the defendant's attorney's conflict of interest. Redaction is another alternative. *United States v. Defazio*, 899 F.2d 626, 630–631 (7th Cir.1990). Exclusion of the evidence implicating the conflict of interest is yet another. *United States v. Gearhart*, 576 F.3d 459, 464 (7th Cir.2009)("Like the majority of our sister circuits, we have adopted a balancing test when the government seeks to introduce evidence that would create a conflict of interest for the defendant's attorney. * * * Specifically, we have held that the introduction of evidence that would generate a conflict of interest is subject to analysis under Rule 403 of the Federal Rules of Evidence. * * * In particular, a district court may 'on rare occasions' exclude evidence to resolve a conflict of interest when 'the probative value of the evidence is weighed against the negative consequences of admitting the evidence.' [*United States v. Messino*, 181 F.3d 826,] 830 [ (7th Cir. 1999) ]" (Citations omitted.)).

■ The undersigned finds that the circumstances which the United States reference as the basis for disqualifying Mr. Stientjes evidence no actual or potential conflict of interest and therefore do not fall under *Wheat* and the decisions under it. Rather, they present an unsworn witness problem. Mr. Stientjes arranged for the repatriation of $2.2 million of the funds from Dr. Brodnik's offshore accounts for the purpose of paying taxes upon those funds. Specifically, by his June 5, 2008, email (Document No. 51, Exhibit 2.), Mr. Stientjes notified Blenheim representatives that "[p]ursuant to a change in U.S. law, regarding foreign deferred compensation arrangements, Dr. Brodnik is required to report and pay tax in the year

ending Dec. 31, 2007 on amounts set aside for his benefit by his former foreign employer (to satisfy its future obligations under the deferred compensation arrangement.)" On June 10, 2008, Mr. Stientjes sent a letter to a Blenheim entity (IALB) requesting that the entity "modify the [deferred compensation] arrangement to allow for a partial accelerated payment equal to the tax liability that must be paid by Dr. Brodnik before June 15, 2008." (*Id.*) Mr. Stientjes estimated "that the tax liability could equal up to $2,200,000." (*Id.*) On June 11, 2008, Mr. Stientjes emailed Blenheim a "proposed partial distribution agreement." (*Id.,* Exhibit 4.) On June 13, 2008, Blenheim notified Mr. Stientjes that it had sent the proposed Modification and Distribution Agreement to its attorney in the United States, Mr. James Jantos. (*Id.*) There is no indication in the record of communications between Mr. Stientjes and Blenheim from June 13 to October 9, 2008. On October 9, 2008, Blenheim emailed Mr. Stientjes that "we have now conferred with counsel regarding the requested distribution to Randy Brodnik. Attached please find an amended version of the 'Distribution Agreement' that you initially drafted and proposed. The agreement will need to be executed by Dr. Brodnik and finalized prior to the release of the funds." (*Id.*) It appears that Dr. Brodnik signed the Distribution Agreement and Mr. Stientjes sent it to Blenheim on or about October 14, 2008. (*Id.,* Exhibit 5.) Soon thereafter, Mr. Stientjes, acting as Dr. Brodnik's agent, received disbursements from Blenheim from Dr. Brodnik's accounts and made payments to the IRS upon Dr. Brodnik's tax liability. (*Id.,* Exhibit 6.) The United States asserts that these circumstances evidence that Dr. Brodnik had control of and access to the funds which Blenheim held. Moreover, the United States

charges in Count Eight of the Superseding Indictment that these circumstances, among others, amounted to the obstruction of the due administration of the internal revenue laws. The United States intends to introduce testimony and documents respecting these circumstances at trial for proof of a matter material to its tax evasion claims, namely that Dr. Brodnik had access to and control of the funds and therefore was in constructive receipt of them all along. By virtue of his first hand involvement in the circumstances, the United States will likely call Mr. Stientjes to testify about them at trial. Because Mr. Stientjes obtained the funds from Dr. Brodnik's offshore accounts to pay Dr. Brodnik's taxes claiming that there had been changes in the law, it is also likely that Dr. Brodnik and Mr. Kritt might call Mr. Stientjes in their defense. Mr. Stientjes' conduct went beyond the sort of advocacy which the *Diozzi* Court considered. While it does not appear that Mr. Stientjes acted in any way in furtherance of the Defendants' conduct as alleged in the Superseding Indictment as was the case in *Evanson,* he nevertheless was principally involved in negotiations and transactions which brought their conduct to an end. In the words of the *Evanson* Court, Mr. Stientjes "assisted in the production of evidence", and finding no alternative to Mr. Stientjes' disqualification, the undersigned concludes that his disqualification is therefore required.

**C. Dr. Brodnik's Motion to Strike the Expert Testimony of Robert L. *Sommers (Document No. 53.)***

■ The United States attached the Expert Opinion of Mr. Robert L. Sommers to its August 27, 2009, Motion to Disqualify Mr. Stientjes (Document No. 49.) as Exhibit A.[17] Dr. Brodnik requests that the

17. Dr. Brodnik attached the expert report of attorney Eric Johnson to his December 31,

2009, Second Motion to Dismiss Indictment in Part (Document No. 96.).

Court strike Mr. Sommers' Expert Opinion. Dr. Brodnik does not contend that Mr. Sommers' expert testimony is not admissible at trial. Rather, citing Federal Rule of Criminal Procedure 47 [18], Dr. Brodnik requests that Mr. Sommers' expert report "be stricken as an exhibit to the Motion to Disqualify and not considered by the Court for the purpose of ruling on the Motion to Disqualify." (Document No. 53, p. 3.) Dr. Brodnik essentially contends that Mr. Sommers' expert report must be stricken because it is replete with conclusions of law and, not being an affidavit, cannot be viewed as establishing any fact pertinent to the disqualification issue. The United States urges that Dr. Brodnik's Motion should be denied because while the Federal Rules of Evidence do not apply in pretrial proceedings, his testimony would be admissible under Rule 704(a) because (1) Mr. Sommers "is highly qualified to offer opinion testimony on the issues contained in his report" and his opinion is supported by the Tax Court's recent decision in *Foxworthy* and (2) Federal Rule of Criminal Procedure 47 does not apply because the United States has not submitted Mr. Sommers' report as an affidavit. The United States states that "the report is attached as an exhibit to provide the Court with a general background of the prosecution's case and its legal positions. * * * The report is not

offered as evidence." (Document No. 57, p. 9.)

The undersigned has regarded the expert reports and opinions of Mr. Sommers and Mr. Johnson as submitted by the United States and Dr. Brodnik in clarification and support of the positions which they have taken in their pretrial Motion, not as establishing any fact or having any evidentiary significance. The undersigned has given no consideration to the expert reports and opinions of Mr. Sommers and Mr. Johnson in addressing the issues raised by the parties' Motions in this Proposed Findings and Recommendation. Having viewing the expert reports in this manner and finding no prejudice to either party by their inclusion in the record, the undersigned respectfully recommends that Dr. Brodnik's Motion to Strike the Expert Report of Mr. Sommers be denied.

**D. *Dr. Brodnik's Motion for Discovery. (Document No. 61.)***

■ By his September 21, 2009, Motion for Discovery (Document No. 61.), Dr. Brodnik requests that the Court order the United States to provide copies of documents and information as follows:

1. All documents and things pertaining to positions which the IRS expressed in its Notices 2003–22, 2006–33 and 2007–89;

---

**18.** Federal Rule of Criminal Procedure 47 provides as follows:

(a) In General. A party applying to the court for an order must do so by motion.
(b) Form and Content of a Motion. A motion—except when made during a trial or hearing—must be in writing, unless the court permits the party to make the motion by other means. A motion must state the grounds on which it is based and the relief or order sought. A motion may be supported by affidavit.
* * *
(d) Affidavit Supporting a Motion. The moving party must serve any supporting

affidavit with the motion. A responding party must serve any opposing affidavit at least one day before the hearing, unless the court permits later service.
The Advisory Committee Notes state that "[t]he last sentence providing that a motion may be supported by affidavit is not intended to permit 'speaking motions' (e.g. motion to dismiss an indictment for insufficiency supported by affidavits), but to authorize the use of affidavits when affidavits are appropriate to establish a fact (e.g. authority to take a deposition or former jeopardy)."

2. All communications between IRS personnel regarding the interpretation of the above-referenced Notices;

3. All communications respecting decisions to pursue taxpayers for violating 26 U.S.C. § 409A or failing to comply with IRS Notices 2006–33 and 2007–89 for participating in a transaction similar to IRS Notice 2003–22;

4. Names, titles and contact information of IRS employees with knowledge about the policy considerations and process in drafting and publishing IRS Notices 2003–22, 2006–3 and 2007–89;

5. The remainder of the 40,000 pages of documents referenced by IRS Special Agent Lanham in interviewing a person from Blenheim on October 8, 2008, which were not previously provided;

6. All testimony and instructions to the Grand Jury pertaining to the United States' theory of liability respecting Dr. Brodnik.

Dr. Brodnik states that "the information requested is material to preparing both its pre-trial motions as well as its trial defense against the various counts in the Indictment subject to Fed. R. Crim. P. 16(a)(1)(E)(I)."[19]

On September 25, 2009, the United States filed a Response objecting to Defendant Brodnik's Motion for Discovery. (Document No. 64.) The United States asserts that (1) Dr. Brodnik's requests for documents and information pertaining to the IRS Notices are "broad and burdensome"; (2) Dr. Brodnik makes nothing more that a conclusory statement that the requested documents and information are material; (3) documents and information pertaining to the development and issuance of the IRS Notices are not part of the investigative file; (4) counsel for the United States in this case has no access to or control over documents and information pertaining to the development and issuance of the IRS Notices; documents and information pertaining to the development and issuance of the IRS Notices are privileged and exempt from disclosure; (5) the United States has provided Defendants with copies of "well over 50,000 pages of password-protected information" on DVD–R disks, made documents not on the disks available for inspection and copying and "would provide [Defendants] with 'open file' discovery subject to limitations . . . ."; and (6) the United States would provide all Grand Jury testimony. The United States attached a copy of September 18, 2009, letter from Mr. Stientjes to its counsel requesting much of the same information requested in Dr. Brodnik's September 21, 2009, Motion for Discovery and the IRS Notices.

On October 5, 2009, Dr. Brodnik filed a Reply to the United States' Response to his Motion for Discovery. (Document No. 65.) Dr. Brodnik contends that the requested documents and information pertaining to IRS Notices 2003–22, 2006–33 and 2007–89 are material because the United States claims that Dr. Brodnik engaged in a plan which falls under IRS Notice 2003–22 and IRS Notices 2006–33 and 2007–89 indicate that federal income taxes upon such a plan were not owing in the years from 1998 through 2003 and did not become owing upon such a plan until 2007. Dr. Brodnik further contends that

---

**19.** Federal Rule of Criminal Procedure 16(a)(1)(E)(i) states as follows:

**(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

(i) the item is material to preparing the defense[.]

the documents and information are material "because the requested information seeks to demonstrate that the IRS has previously made admissions that the tax liability regarding foreign deferred compensation plans is unclear and that Defendant Brodnik's conduct is reasonable." (*Id.*, ¶ 9.) Dr. Brodnik argues that "Notice 2006–33 and Notice 2007–89 are wholly inconsistent with the Indictment and the claims of the United States in this case. In the case at hand, the United States contends that there is a willful violation of 26 U.S.C. § 7201 during the calendar years 1998 through 2003. However, the IRS ... has issued final administrative guidance in Notice 2006–33 and Notice 2007–89 wherein the IRS finds that the tax is due and owing by the identically situated taxpayers as of December 31, 2007." (*Id.*, ¶ 10.)Dr. Brodnik also disputes the United States' claim that the documents and information are privileged. (*Id.*, ¶¶ 16 through 20.)[20]

██ Rule 16(a)(1)(E)(I) allows discovery of documents and things that are "within the government's possession, custody, or control" and "material to preparing the defense[.]" Documents and things are "within the government's possession, custody, or control" if the prosecution has knowledge of and access to them. *United States v. Santiago,* 46 F.3d 885, 894 (9th Cir.1995). Prosecutors are not required to provide documents and things "possessed by agencies which had no part in the criminal investigation or when the prosecution had no control over the agency officials who physically possessed the documents." *United States v. Libby,* 429 F.Supp.2d 1, 6–7 (D.D.C.2006). Documents and things are "material to preparing the defense if they would significantly ... alter the quantum of proof in [defendant's] favor."

*United States v. Farah,* —— Fed.Appx. ——, ——, 2007 WL 2309749, *4 (C.A.4 (Va.)). The United States Supreme Court stated in *United States v. Armstrong,* 517 U.S. 456, 462, 116 S.Ct. 1480, 1485, 134 L.Ed.2d 687 (1996), that "in the context of Rule 16, 'the defendant's defense' means the defendant's response to the Government's case in chief. While it might be argued that as a general matter the concept of a 'defense' includes any claim that is a 'sword', challenging the prosecution's conduct of the case, the term may encompass only the narrower class of 'shield' claims, which refute the Government's arguments that the defendant committed the crime charged." The undersigned finds that Dr. Brodnik has not demonstrated that the documents and information pertaining to the development and issuance of the IRS Notices which he requests are within the possession, custody or control of the prosecution in this case and are material to preparing his defense. While Dr. Brodnik may argue that the Notices themselves are fundamental to his defense, Dr. Brodnik has not shown how the requested documents and information refute the United States' charges as set forth in the Superseding Indictment. The documents and information which Dr. Brodnik requests, therefore, fall beyond the scope of allowable discovery under Rule 16(a)(1)(E)(I), and for this reason and because it appears that the United States has otherwise disclosed or made available all information as required under the Federal Rules of Criminal Procedure and the law, his Motion for Discovery should be denied.

### *PROPOSAL AND RECOMMENDATION*

Accordingly, the undersigned hereby respectfully **PROPOSES** that the District

---

**20.** It appears that the United States has provided Defendants with grand jury material.

(Document No. 106, p. 63.)

Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **DENY** Dr. Brodnik's Motions to Dismiss in Part (Document Nos. 52 and 94.), Mr. Kritt's Motion to Dismiss the Superseding Indictment (Document No. 92.) Dr. Brodnik's Motion to Strike the Expert Testimony of Robert L. Sommers (Document No. 53.) and Dr. Brodnik's Motion for Discovery (Document No. 61.) and **GRANT** the United States' Motion to Disqualify Dr. Brodnik's Counsel, Mr. Robert J. Stientjes, Due to Conflict of Interest (Document No. 49.).

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED,** and a copy will be submitted to the Honorable United States District Judge Irene C. Berger. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have thirteen days (ten days, filing of objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour,* 889 F.2d 1363, 1366 (4th Cir.1989); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); *Wright v. Collins,* 766 F.2d 841, 846 (4th Cir.1985); *United States v. Schronce,* 727 F.2d 91, 94 (4th Cir.) *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.